360 So.2d 441 (1978)
DADE COUNTY, a Political Subdivision of the State of Florida, Appellant,
v.
O.K. AUTO PARTS OF MIAMI, INC., a Florida Corporation and National Indemnity Company, a Nebraska Corporation, Appellees.
No. 77-1712.
District Court of Appeal of Florida, Third District.
June 20, 1978.
Rehearing Denied July 28, 1978.
*442 Stuart L. Simon, County Atty. and James G. Roth, Asst. County Atty., for appellant.
Charles F. Atwood, III, Miami, for appellees.
Before HAVERFIELD, C.J., BARKDULL, J., and PARKER, J. GWYNN (Ret.), Associate Judge.
PER CURIAM.
This is an appeal by Dade County, plaintiff and counter-defendant in the trial court, from a final judgment which resulted in an award of $90,817.00 plus interest of $8,627.62 to the defendant/counter-claimant, O.K. Auto Parts of Miami, Inc. [O.K.]. The county asserts that the trial court erred in its award of damages to O.K. and in its award of interest on those damages. We agree and reverse the decision of the trial court on the counterclaim only.
A careful review of the record reveals that the damages awarded to O.K. were speculative in that insufficient evidence was adduced upon which to predicate the award. Itvenus, Inc. v. Poultry, Inc., 258 So.2d 478 (Fla. 3d DCA 1974); Ballard v. Krause, 248 So.2d 233 (Fla. 4th DCA 1971); Belcher v. Import Cars, Ltd., 246 So.2d 584 (Fla. 3d DCA 1971).
Additionally, it is the general rule, grounded on public policy considerations, that, in the absence of a statute or an express contract to the contrary, a county is not liable for interest on its obligations. Treadway v. Terrell, 117 Fla. 838, 158 So. 512 (1935); Duval County v. Charleston Engineering & Contracting Company, 101 Fla. 341, 134 So. 509 (1931); Broward County Port Authority v. Arundel Corporation, 206 F.2d 220 (5th Cir.1953). See generally Annot., 24 A.L.R.2d 928 (1952); 8 Fla.Jur. Counties, Section 99 (1956); 30 Fla.Jur. State of Florida, Sections 50, 51 (1974).
Moreover, counter-claimant admits that to support an award of interest, the amount in question must be liquidated. It is the opinion of this court that the damages awarded to O.K. in this case could not properly be considered as liquidated damages because they were not stipulated *443 at the time of entering the contract as being payable as compensation for injuries in the event of breach.
Although we have concluded that the decision of the trial court must be reversed because of the lack of substantial, competent evidence to support the award of damages and because the court erred in awarding interest on the judgment, we deem it necessary to reach the issue of whether the contract was sufficient to support the counter-claimant's cause of action. We find that the contractual provision upon which O.K. relied to assert its claim was incorrectly construed as an absolute guarantee by the trial court. Reversal is also required as to that element of the decision which found the county liable for damages under the contract.
The background underlying the actions below reveals that, for some years, Dade County had faced the problem of abandoned cars left strewn about the county. In order to alleviate the situation, the county adopted a procedure of contracting with independent towing companies to remove these abandoned hulks. Until 1974, the county had paid the towing companies a fee for each vehicle removed, the yearly contracts having been awarded to that bidder which charged the county the least to perform these services. In 1974, however, the value of scrap metal had risen, and O.K. offered to pay the county $11.00 per car for the exclusive right to tow away cars tagged by the county for removal pursuant to Chapter 705, Florida Statutes (1973). O.K. was awarded the contract as low bidder. The contract was executed on October 25, 1974, to extend through September, 1975, and provided, among other things, that the county would guarantee the contractor a minimum of 14 pickup authorizations a day.
Over the term of the contract, Dade authorized O.K. to pick up over 1500 vehicles, but did not authorize pickups of 14 vehicles a day. While evidence indicated that the contractor's opportunities to remove tagged cars may have been limited both by the action of the county in decreasing the staff assigned to tag the cars for removal and by the actions of other towing companies, O.K. had removed over 650 hulks by the termination date of the contract.
As of March 18, 1975, O.K. had paid the county only $330.00, although it had picked up well over 400 cars. No other monies were remitted by O.K. to the county. On May 8, June 9, and June 16, 1975, the county sent letters to O.K. demanding payment for vehicles actually picked up. On August 29, 1975, the county informed O.K. in a final letter of its intent not to renew the contract and to sue for back payment for vehicles "shown on pick-up lists and which were and will be picked up" through the termination date of the contract. O.K. never responded.
In September, 1975, Dade filed suit for non-performance of contractual obligations. O.K. counterclaimed, alleging that Dade had breached its guarantee of 14 authorizations per day, and seeking damages for anticipated profits based on a minimum of 14 pickups a day.
The trial court awarded Dade $6,842.00 on its claim, and awarded O.K. $97,659.00 on its counterclaim. After setting off the sum due the county from that awarded O.K., the court ordered that O.K. recover the sum of $90,817, plus interest of $8,627.62.
Counter-defendant, Dade County, urges that the guarantee was a nullity, and that even if it was not, O.K. had waived its right to assert non-compliance with the guarantee. We do not agree with Dade's first assertion, but do hold that the guarantee provision, when read in conjunction with the rest of the contract, was not absolute, and that counter-claimant, by its own inaction, waived its right to claim a breach of the guarantee agreement.
That proviso, one of many in a lengthy document, read:
13. GUARANTEE
Dade County will guarantee to the Contractor a minimum of seven abandoned vehicles each day per zone (5 days per week excluding County Holidays, Saturday or Sunday). The seven vehicles per day per zone would include all sources *444 such as the County, the City of Miami, the City of Miami Beach, and all other municipalities.
For the purpose of this Contract, payment shall be made for each attempt made for abandoned vehicle pickup when authorized and directed by the County. This "attempt" shall constitute a "unit" in payment calculation referred to below.
The guarantee of seven cars each day per zone, will be at the unit rate bid for each. Such guaranteed amount shall be based on the averaging of the total amount of abandoned vehicles removed in a single monthly pay period.

Example 1: If there were 20 work days in a monthly pay period and 125 authorized pickup attempts by the Contractor, payment would be made for 140 units (20 X 7), thus complying with the minimum guarantee.

Example 2: If there were 20 work days in a monthly pay period and 165 authorized pickup attempts by the Contractor, payment would be made for 165 units. (Emphasis in original).
This provision was a remnant of the days when the county had paid the contractor for abandoned vehicle removal, and was intended originally to assure such contractor a minimum sum for his efforts. However, O.K. argues that it relied on the guarantee of 14 cars a day as a basis for its bid, contending it never would have gone into the arrangement unless it was assured of a quantity of hulks sufficient to merit the expense of its involvement.
The contractual language precludes the county from denying the existence of a guarantee which was viable at the time of making. However, the provision covers both a minimum number of units to be authorized and a sum payable for each vehicle so tendered.
It is apparent that the guarantee itself does not stipulate who shall pay whom for authorized pickup attempts. The ambiguity between the words of guarantee and the words of payment is the responsibility of the county, which both prepared the documents and failed to either rephrase or eliminate this provision. In construing the ambiguous provision most strongly against the drafter, we are compelled to resolve the question of whether there was any viable guarantee against the county. But a construction which resolves ambiguities against the drafter does not eliminate the necessity of attempting to discern the intent of the parties at the time of contracting. Where the language used is ambiguous it is the duty of the court to ascertain the intent of the parties as manifested by both the document itself and by the circumstances surrounding the parties at the time of contracting.
The instrument is a multi-faceted one, and this single provision cannot be viewed apart from the many others included therein. Among these is a "Bid Form," which showed O.K.'s proposal to pay the county $11.00 per unit "based on what is towed in by O.K. wreckers in both zones 1 & 2," and revealed the following alteration:
"... THE UNDERSIGNED BIDDER AGREES TO ... ACCEPT THE ABOVE UNIT PRICE AS FULL COMPENSATION FOR / THE WORK PERFORMED... ." / PAY
The "Bid Form" showing the contractor's promise to pay on the basis of what is towed in appears to conflict with any assertion that the county was expected to unconditionally guarantee a minimum of 14 cars a day, because this would have to mean that O.K. intended to bind itself unconditionally to pay the county $154.00 a day for each working day, regardless of what it towed in. This conflict, resolved most favorably toward O.K. at the time of contracting, indicates that the contractor intended to pay only for what he actually towed in.
Another clause of the contract at issue provided:
"To prevent all disputes and litigations, it is agreed by the parties hereto that the Director shall decide all questions, difficulties and disputes of whatever nature which may arise relative to the interpretation of the fulfillment of this Contract, and as to the character, quality, amount and value of any work done by reason of this Contract, and his estimates and decisions *445 upon all claims, questions, and disputes shall be final and conclusive upon the parties thereto."
O.K. did not call any possible claim to the attention of the county under the above "disputes" clause, or otherwise make any demand under the guarantee clause throughout the term of the contract, although it did complain to the county that the actions of so called "gypsy" wreckers, towing companies who picked up abandoned vehicles without proper authorization, cut into its expected number of pickups. O.K. did not approach the county to reform the contract. Even the series of letters the county sent elicited no response from the contractor. Not until suit was initiated by the county did O.K. evince any indication that it felt the guarantee clause had been breached, or even that the clause was a material one.
Therefore, although a guarantee was a part of the contract, and cannot be construed to be a nullity, as Dade contends, the guarantee is contradictory in itself, and stands in contradiction to other elements of the contract as well as to the apparent intent of both parties as evidenced both at the time of contracting and throughout the course of performance. The actions of the parties as they operated under the contract demonstrate that neither side treated the guarantee provision as an unconditional promise by the county to provide the authorizations enumerated.
We hold that the county did guarantee to provide O.K. with a minimum of 14 abandoned vehicles a day, but that this guarantee was understood by both parties to have been conditioned on O.K.'s payment to the county of $11.00 per guaranteed vehicle per day, a condition which was substantially ignored by O.K. Where one party's cooperation is an implied condition of a contract, and that cooperation is not forthcoming, the recalcitrant party is estopped by his own recalcitrance from claiming reliance on the other party's promise. Therefore, we further hold that, by its own inaction, O.K. waived any right to performance of the guarantee and is estopped to claim damages as a result of any alleged breach.
Reversed.