**FIRST NATIONWIDE BANK, a Federal Savings Bank, and Pathway Financial, a Federal Association, a federal savings and loan association, Plaintiffs/Counterdefendants,**

v.

**FLORIDA SOFTWARE SERVICES, INC., a Florida corporation and The Kirchman Corporation, a Georgia corporation, Defendants/Counterplaintiffs,**

v.

**FIRST NATIONWIDE FINANCIAL CORPORATION, Additional Counterclaim Defendant.**

**KIRCHMAN CORPORATION and Florida Software Services, Inc., Plaintiffs,**

v.

**PATHWAY FINANCIAL, F.A., and First Nationwide Financial Corporation, Defendants.**

Nos. 89–188–CIV–ORL–18, 89–189–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

July 19, 1991.

Jonathan Cohen, Shutts & Bowen, Miami, Fla., for plaintiffs/counterdefendants.

Alan M. Gerlach, Litchford, Christopher & Milbrath, Orlando, Fla., for defendants/counterplaintiffs.

## ORDER AND OPINION

KELLAM, Senior District Judge, Sitting by Designation.

First Nationwide Bank ("FNB") and Pathway Financial, A Federal Association ("Pathway") filed this declaratory judgment action on March 3, 1989 against The

Kirchman Corporation ("Kirchman") and Florida Software Services ("FSS"). FNB and Pathway seek a determination by the Court that they are not in breach of antiassignment clauses contained in certain computer software licensing agreements with Kirchman and FSS. Kirchman and FSS subsequently filed a breach of contract counterclaim against FNB and Pathway on March 24, 1989. By Order of May 29, 1989 the two cases were consolidated, and after lengthy discovery, they were tried on February 26 & 27, 1991.

## I.

This case is based largely on undisputed facts. In December 1988, the Federal Home Loan Bank Board ("FHLBB") approved the acquisition of two insolvent savings and loan associations by FNB. With federal assistance, FNB purchased substantially all of the assets and liabilities of the insolvent Bloomfield Savings and Loan Association, F.A. ("Bloomfield") from the Federal Savings and Loan Insurance Association ("FSLIC"). Also in December of 1988, pursuant to a federally supervised conversion, First Nationwide Financial Corporation ("FNFC") purchased 100% of the common stock of Pathway, which was also insolvent. These facts were stipulated.

Bloomfield had been declared in "default" pursuant to 12 U.S.C. § 1724(d), and the FSLIC, as receiver, was authorized to liquidate Bloomfield.[1] Upon the appointment of the FSLIC as receiver, FNB applied for permission to acquire substantially all of the assets of Bloomfield. The FHLBB approved the acquisition as the most desirable alternative to liquidation.

Pathway was converted from a mutual savings association to a stock association under the supervision of the FHLBB. The FHLBB determined that such a supervisory conversion was required under 12 U.S.C. § 1464(p) since Pathway was insol-

vent. Pursuant to 12 U.S.C. § 1730a(e), FNB applied for prior written approval to acquire Pathway through a supervisory conversion. The FHLBB approved the acquisition because Pathway was a failing institution and the acquisition of Pathway would lessen the risk to the taxpayer.

Prior to their acquisition, Pathway and Bloomfield had licensed computer software packages from Kirchman and FSS.[2] The terms of Pathway's basic license agreements were from December 1986 to December 1991; and the term of Bloomfield's was from April 1985 to April 1990. In addition to regular quarterly payments, the license agreements required Pathway to pay Kirchman and FSS $561,995 in license fees upon execution of the license agreements; Bloomfield, in addition to the quarterly payments, was required to pay $200,000 in license fees. The license agreements contained anti-assignment clauses which were substantially identical and stated as follows:

"Customer shall not, without prior written consent of FSS, sell, lease, transfer or assign its interest as Licensee under this Agreement, or sell, lease, assign, transfer, sublicense or permit the duplication, reproduction or copying of the FSS Property (except as a part of standard computer industry backup procedures), or otherwise make available for any purpose, whether gratuitously or for consideration, the FSS Property or any part thereof or any information pertaining thereto, to any person or entity whatsoever [other than (i) employees of the Customer for use by them solely in connection with the performance of data processing services by customer, (ii) independent Certified Public Accountants for auditing purposes, or (iii) for compliance with governmental regulatory authorities]. The transfer of more than sixty percent (60%) of the common stock of

---

1. Section 401(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. 101–73 Stat. 183 (1989) ("FIRREA"), abolished the FSLIC. The FDIC succeeded to the rights of the FSLIC with respect to receiverships created prior to the enactment of FIRREA. *See Carrollton–Farmers Branch Ind.*

*School Dist. v. Johnson & Cravens,* 889 F.2d 571, 572–73 (5th Cir.1989); *See* FIRREA § 401(f)(2).

2. Pathway entered into agreements with both Kirchman and FSS; Bloomfield signed an agreement with FSS only.

Customer, without the prior written consent of FSS, shall be deemed an attempted transfer of this License Agreement and the license granted herein, which is in violation of the prohibitions against transfer contained in this Paragraph.... Such consent shall not be unreasonably withheld."

In January 1989, Kirchman and FSS sent letters to FNB and Pathway which asserted that the acquisition by FNB violated the anti-assignment clauses contained in the license agreements. The letters advised that Kirchman and FSS would terminate the license agreements within twenty days, and that the computer system was to be returned within ten days of the Notice of Termination. The letters went on to state that Pathway could continue using the computer system if they executed a new License Agreement and paid a new license fee of $1,187,000; Bloomfield could continue using the system for a new license fee of $754,000. After receiving these letters, Pathway and FNB initiated this action for declaratory relief; Kirchman and FSS filed immediately thereafter.

Regardless of the termination letters, FNB and Pathway continued using the computer software and making the quarterly payments to Kirchman and FSS. At first, Kirchman and FSS continued to accept the quarterly payments under the original license agreements and continued to send software information to Pathway and FNB. Kirchman and FSS subsequently refused to accept the quarterly payments; as a result, FNB and Pathway have continued to deposit the remainder of the quarterly payments into the Court registry. Upon the scheduled termination of Bloomfield's contract in April of 1990, all of the software materials and equipment were returned to FSS.

Although Bloomfield and Pathway never sought the consent of Kirchman or FSS before the acquisitions, the evidence at trial establishes that to do so would have been both improper and futile. Testimony at trial showed that information concerning the acquisitions of the assets and converted stock of said institutions was highly confidential, and any dissemination of that information was strictly regulated: the reason being that if information of the proposed acquisition leaked out, the insolvent institutions' depositors may have become concerned and made a run on the institutions' deposits. Such an occurrence would devastate the value of the institutions. Furthermore, testimony at trial established that even if FNB and Pathway had requested consent prior to the acquisitions, consent still would have been withheld until the payment of the higher license fees.

The evidence further established that no expansion of the software's use occurred and no one gained access to Kirchman and FSS trade secrets other than the parties to the original agreements; this fact is illustrated by Kirchman and FSS's withdrawal of allegations of trade secret violations in their counterclaim. Although Kirchman and FSS received assurances that no unauthorized use of the software would occur, they still refused to consent to the assignment of the license agreements unless FNB and Pathway would agree to pay the increased license fees. Furthermore, the evidence established that Kirchman and FSS suffered no damages.

## II.

In 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which amended 12 U.S.C. § 1821. The statute was obviously passed with the public welfare in mind. According to a House Report on the subject of FIRREA,

The interests of the American taxpayer demand an expedited resolution to the monumental problems involved with the unprecedented costs of dealing with hundreds of insolvent thrifts and the orderly disposition of the assets of these failed institutions.

H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1 at 308 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 104.[3] Several

---

3. The particular section of FIRREA at issue in this case is 12 U.S.C. § 1821(d)(2)(G)(II), which

courts have held FIRREA to be applicable to cases, such as the instant case, pending at the time of FIRREA's enactment. *See FDIC v. 232, Inc.*, 920 F.2d 815 (11th Cir. 1991).

In *Bayshore Executive Plaza Partnership v. Federal Deposit Insurance Corporation*, 750 F.Supp. 507 (S.D.Fla.1990), the Court was presented with the question of retroactive application of FIRREA. In that case, the plaintiff entered into two lease agreements with Bayshore Bank. In August of 1987, approximately eleven months after the lease agreements were entered into, Bayshore Bank was declared insolvent and the FDIC was named as liquidator. As liquidator, the FDIC decided to disaffirm the lease agreements which Bayshore Bank had entered into with the plaintiff. The plaintiff subsequently sued the FDIC for the value of the leases. The Court held that 12 U.S.C. § 1821(e), as amended in August of 1989, applied retroactively to the facts of the case and, therefore, granted summary judgement in favor of the FDIC.[4]

■ In the present case, the Court is presented with an issue similar to that in *Bayshore:* the issue being whether 12 U.S.C. § 1821(d) should be applied retroactively to the facts of this case. Although this case was filed in March of 1989, and FIRREA was not signed into law until August of 1989, it is well established that a court is to apply the law in effect at the time it renders its decision unless manifest injustice would result. *Bradley v. Richmond School Board*, 416 U.S. 696, 716, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1974); *see U.S. v. Kolter*, 849 F.2d 541, 543 (11th Cir.1988) (a new statute should apply to cases pending on the date of its enactment unless manifest injustice would result or there is a statutory directive or legislative history to the contrary).

In applying 12 U.S.C. § 1821(d)(2)(G)(II) to the facts of this case, the Court is of the opinion that no manifest injustice would occur because there is almost no legitimate private expectation which outweighs the public interest in enforcing FIRREA. Kirchman and FSS have suffered no damages and will not be harmed by the application of FIRREA to the facts of this case. They have already been paid their license fees and there is no legitimate basis for them to demand another fee for no additional services. They have continued to receive the agreed payments for the use of their software and have, admittedly, suffered no harm as a result of unauthorized use or trade secret violations. In short, application of FIRREA does not infringe on any substantive right of Kirchman and FSS. Accordingly, the Court holds that 12 U.S.C. § 1821(d)(2)(G)(II) authorized the FSLIC to transfer the License Agreements to FNB without the approval or consent of either Kirchman or FSS. As such, Kirchman and FSS's allegations that the acquisitions by FNB violated the anti-assignment clauses of the contracts are without merit.

### III.

■ Even if the Court were to hold that FIRREA was not applicable to the facts of this case, Kirchman and FSS would still have no cause of action under Florida contract law. In each of the license agreements, the parties stipulated that the agreements would be governed by and construed in accordance with the laws of the state of Florida. Such a forum selection clause is to be specifically enforced unless it is clearly established that enforcement of the clause would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching. *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *see Stewart Organization, Inc. v. Ricoh Corp.*, 810 F.2d 1066 (11th Cir.1987), *affirmed* 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). Additionally, forum se-

---

provides that the FDIC, as conservator or receiver, may "transfer any asset or liability of the institution on default ... without any approval, assignment, or consent with respect to such transfer."

**4.** 12 U.S.C. § 1821(e) authorizes the receiver of a banking institution to repudiate any contract or lease which it determines to interfere with the process of winding up the bank's affairs.

lection clauses have the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended, sparing litigants the time and expense of pretrial motions to determine the correct forum, and conserving judicial resources that otherwise would be devoted to deciding those motions. *Carnival Cruise Lines, Inc. v. Shute*, — U.S. —, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). Accordingly, the Court will apply the law of Florida in deciding whether FNB's acquisition of Bloomfield and Pathway constitutes a breach of the license agreements.

 Every contract includes not only its written provisions, but also the terms and matters which, though not actually expressed, are implied by law, and these are as binding as the terms which are actually written or spoken. *Sharp v. Williams*, 141 Fla. 1, 192 So. 476, 480 (1939). One such implied term of a contract, recognized by Florida law, is the implied covenant of good faith and commercial reasonableness. *Fernandez v. Vazquez*, 397 So.2d 1171 (Fla. Dist.Ct.App.1981); *Amjems, Inc. v. F.R. Orr Construction Company, Inc.*, 617 F.Supp. 273 (S.D.Fla.1985). A party's good faith cooperation is an implied condition precedent to performance of a contract, and where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing himself of his own wrongdoing. *Fernandez*, 397 So.2d at 1174 (citing *Dade County v. O.K. Auto Parts of Miami, Inc.*, 360 So.2d 441 (Fla.Dist.Ct.App. 1978)).

The *Fernandez* case provides some persuasive insight to Florida contract law. The issue in the *Fernandez* case was whether a lessor could refuse to consent to the assignment of a commercial lease in order that he may charge a higher rent than originally contracted for. The Court in that case held that a lessor may not arbitrarily refuse consent to an assignment of a commercial lease which provides, even without limiting language, that a lessee shall not assign the lease without the written consent of the lessor. *Fernandez*, 397 So.2d at 1174; *see e.g. Ringwood Associ-*

*ates, Ltd. v. Jack's of Route 23, Inc.*, 153 N.J.Super. 294, 379 A.2d 508, 512 (1977) ("The fact that the lessor could obtain a higher rent under a new lease agreement but not under an assignment of [the tenant's] lease did not justify the lessor's refusal to consent to the assignment."); *Funk v. Funk*, 102 Idaho 521, 633 P.2d 586 (1981) (court will not uphold a landlord's arbitrary refusal of consent where it is apparent that the refusal to consent was withheld for purely financial reasons and that the landlord wanted the lessees to enter into an entirely new lease agreement with substantial increased financial benefits to the landlord.); *Cowan v. Chalamidas*, 98 N.M. 14, 644 P.2d 528 (1982) (a landlord may not unreasonably and arbitrarily withhold consent to a subleasing agreement when the lease agreement merely provides that the tenant must obtain the written consent of the landlord before subleasing). The Court in *Fernandez* went on to state that a withholding of consent to assign a lease, which fails the tests for good faith and commercial reasonableness, constitutes a breach of the lease agreement. *Fernandez*, 397 So.2d at 1174; *see Brickell Associates, Ltd. v. Stinson, Lyons & Schuette, P.A.*, 522 So.2d 459 (Fla.Dist.Ct.App.1988). The Court held that denying consent solely on the basis of personal taste, convenience or sensibility or in order that the landlord may charge a higher rent than originally contracted for are all arbitrary reasons which fail the tests of good faith and reasonableness under commercial leases. *Id.*

### IV.

In the case at bar, it appears that the sole reason Kirchman and FSS refused to consent to the assignment of the license agreements was the refusal of FNB and Pathway to pay new and substantially increased license fees. Such conduct on the part of Kirchman and FSS is contrary to the general contract principles of good faith and fair dealing. Indeed, such demands for higher license fees and the refusal to provide ongoing customer service and technical support may, themselves, constitute a breach of the license agree-

ments. Florida law is clear—a lessor may not withhold consent to the assignment of a lease in order to charge a higher rent than originally contracted for. *Fernandez*, 397 So.2d 1171. Although the case at bar involves a license agreement, the same basic contract principles apply. The license agreement in this case is, for all practical purposes, a commercial lease between a computer software company and a financial institution.

Under the rule set forth in the *Fernandez* case, Kirchman and FSS are bound to act in a commercially reasonable manner under the license agreement. Commercial reasonableness is determined by reference to the provisions negotiated in the original license agreements, and not by reference to what Kirchman and FSS later find most economically advantageous. *See B.M.B. Corp. v. McMahan's Valley Stores*, 869 F.2d 865, 869 (5th Cir.1989).

In addition to Florida case law, Kirchman and FSS also have a statutory duty of good faith under the UCC. The pervasive view is that computer software programs are "goods" under the UCC. *See e.g. Systems Design Management Information, Inc. v. Kansas City Post Office Employees Credit Union*, 788 P.2d 878 (Ct.App.Kan.1990); *RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543, 546 (9th Cir.1985); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir.1979). Under Florida's version of the UCC there is an "obligation of good faith in a contract's performance or obligation." Fla.Stat. § 671.203.

The facts of this case are plain and simple: two insolvent financial institutions under the control and supervision of a government agency are acquired by another financial institution in the interests of the public welfare; a computer software company leasing equipment to the insolvent financial institutions which has already been paid its license fees uses the unfortunate circumstances to demand new license fee increases of more than three hundred percent or have the original license agreements terminated; although no unauthorized use of the software occurred, the license agreements, for which the original fees had been paid,

were terminated; the president of the software company admits that the license agreements were terminated because the newly acquired institutions would not pay the increased license fees. Such an attempt at extortion is obviously contrary to the spirit of good faith and cooperation implied in the very license agreements which Kirchman and FSS terminated.

Kirchman and FSS now ask this Court to reward their actions by holding that Pathway and Bloomfield breached the license agreements by not obtaining Kirchman and FSS's consent before the acquisitions by FNB. As the evidence established, Pathway and Bloomfield were prohibited, under federal confidentiality rules, from notifying Kirchman or FSS of the proposed acquisition. Even assuming that they had notified Kirchman and FSS, the testimony of Mr. Kirchman established that consent would still have been withheld until the higher fees were paid. Mr. Kirchman also testified that the anti-assignment clauses were designed to protect his company from unauthorized use of the computer software. However, the evidence showed that no trade secret violations occurred as a result of the acquisitions, no unauthorized use of the software took place and Kirchman and FSS continued to receive all payments due under the original contracts.

No desirable public policy is served by allowing Kirchman and FSS to extract an undeserved windfall as a result of the unfortunate circumstances which forced Bloomfield and Pathway into insolvency. It was in the public interest and the best interest of depositors and creditors that FNB's federally-assisted acquisitions of Bloomfield and Pathway were arranged. Ironically, if Bloomfield and Pathway had been liquidated, Kirchman and FSS may have received little, if any, of the monies owed to them by those financial institutions. Instead, as a result of the acquisitions, Kirchman and FSS now have contracts with solvent institutions that have continued to make payments and have promised to protect the software from unauthorized use.

A contract is an agreement whereby each party promises to perform their part of the bargain in good faith, and expects the other party to do the same. Under the contracts in dispute here, Bloomfield and Pathway agreed to pay for the computer software and protect against its unauthorized use. Kirchman and FSS agreed to let Pathway and Bloomfield use the software and promised that they would not unreasonably withhold any consent to an assignment of the contracts. The evidence in this case establishes that Bloomfield and Pathway have performed their part of the bargain, Kirchman and FSS have not. It is the opinion of the Court that Kirchman and FSS acted unreasonably by withholding consent to the assignment until FNB and Pathway paid substantially increased license fees.

It is therefore ordered

1. That the acquisition of the Bloomfield License Agreement by the FSLIC as receiver and the subsequent federal statutorily-authorized sale by FSLIC as receiver to FNB, and the use of the products of said license agreement by FNB did not violate the anti-assignment provisions of said license agreement or entitle Kirchman or FSS to a new license fee, and said referred to anti-assignment provisions have not been violated.

2. That the acquisition by FNFC of the capital stock of Pathway under the statutorily-authorized supervisory conversion of Pathway from a mutual to a stock association by FHLBB and the subsequent statutorily-authorized sale of Pathway's newly issued stock to FNFC does not violate the anti-assignment provisions of the Pathway License Agreement so as to entitle Kirchman and FSS to terminate such agreement or to be entitled to a new license fee.

3. The Bloomfield agreement having expired, and the software having been returned to Kirchman and FSS, Kirchman and FSS are entitled to receive the fees deposited in the registry of the court as the quarterly sums due under the agreement. The Clerk will therefore pay said sums to Kirchman and FSS.

4. FSS and Kirchman are likewise entitled to the quarterly payments due under the Pathway Agreement which have been deposited into the registry of this court, and the Clerk is directed to make such payments to them.

5. Pathway shall make any future quarterly payments due under the license agreement directly to Kirchman and FSS.

6. Kirchman and FSS are not entitled to any relief under their counterclaims filed herein, since the counterclaims are dismissed.

7. Plaintiffs shall recover their costs.