VAN NORTWICK, J.
Don G. McCoy (McCoy), Charles Voo-rhis, Larry L. Lee, Gary Walsingham, and Harvey Hollingsworth, derivatively on behalf of nominal defendant Magic Broadcasting, LLC (Magic),[1] a Florida limited liability company (LLC), appeal a final order granting summary judgment in favor of Michael E. Durden (Durden), Durden Enterprises II, Inc. (DE2), a Delaware corporation, and Durden Enterprises, LLC (DEI), a Florida limited liability company, appellees, in the appellants’ action for breach of fiduciary duty and an accounting. Because there are numerous questions of material fact relating to whether the appellees breached their duty *401 of loyalty under the Florida Limited Liability Company Act (LLC Act), section 608.4225, Florida Statutes (2011),[2] as modified by the operating agreement for Magic, the trial court erred in granting summary judgment. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

Background

The appellants were members of Magic, which was formed to acquire and operate radio stations. DEI and DE2 were lenders which financed the business operations and capital investment for Magic. Durden is the principal individual behind DEI and DE2. Earl Durden, the now-deceased father of Michael Durden, originally formed DEI and is discussed in the record and briefs, but he is not a party to this action. Magic’s board is comprised of five directors, all of whom are deemed LLC managers of Magic, but only some of whom are also members of the LLC. The initial five-person board directors of Magic were Earl Durden, Michael Durden, Scott Helms (all of whom represented the interests of DEI and DE2), McCoy, and James Milligan.
In January 2006, Magic purchased two California radio stations utilizing a loan of $65 million from DEI. Earl Durden, either individually or through entities created by him, held the greatest equity interest in Magic at the time of the loan. Magic defaulted on the loan from DEI in 2007. An extension of this loan was granted and another default occurred in 2008. At the time of the 2008 default, the promissory note was owned by DE2, as successor to DEI. Appellants allege these defaults re-suited from the Durdens’ nefarious influence on the operations of Magic. It is undisputed that, as a condition of refinancing, DE2 required that the Board of Magic accept the terms of an amended operating agreement. At that time, the Durdens still owned the largest equity interest in Magic. It is also undisputed that all LLC members of Magic knew of the contents of the operating agreement and the potential conflicts of interest that would arise from the creditor-debtor relationship between DE2 and Magic. The LLC members approved the new operating agreement and a new credit agreement was entered between DE2 and Magic.
The credit agreement provides that “Durden Enterprises II, Inc. [DE2], or its Affiliates, in its capacity as a member, shall have the right to designate three representatives [to the board of directors] who initially will be Earl Durden, Michael Durden, and Scott Helms (the ‘Durden Managers’).” According to McCoy’s affidavit (and not otherwise disputed), Michael Durden became CEO of Magic by virtue of DE2’s control of the board.[3] McCoy’s affidavit states that Durden immediately began taking actions that were intentional, unreasonable, and unfair to Magic, and that his actions constituted bad faith and were intended to set Magic up for financial failure. McCoy asserts that Durden’s actions materially adversely affected the business of Magic. The affidavit states that, at a Magic board meeting on May 17, 2010, the Durden-led board discussed McCoy’s proposal to acquire Magic for $62 million and rejected the proposal. McCoy states that during the meeting, Durden *402 stated that “[W]e would never sell the stations to McCoy.” The affidavit states that the board neither considered any of the factors set forth in paragraph 5.6 of the operating agreement nor followed the procedures required by that section. McCoy asserts that it was clear that Dur-den never intended to abide by the principles of good faith and fair dealing by meaningfully considering McCoy’s proposal.
McCoy avers that the board agreed to sell Magic’s California stations to an outside party, SoCal935 LLC (“SoCal935”), for approximately $35 million. McCoy asserts that the SoCal935 proposal was vastly inferior to his, because the offer by SoCal935 was $27 million less than McCoy’s offer and, under the SoCal935 offer, Magic would remain liable for the balance of the DE2 loan. The SoCal935 agreement was never consummated and the stations were never sold.
The McCoy affidavit states that to further impair Magic, the Magic board sold the Dothan, Alabama radio station cluster for $1.85 million in 2011. McCoy asserts that Magic had originally invested $12 to $16 million in those stations and that they had a value of at least $6 million when Durden caused them to be sold. He states that there was no reasonable, rational reason to sell the stations for such a low price and that selling the stations at such a low price was unfair, unreasonable, and contrary to the Magic operating agreement.
Appellants, as members of Magic, filed a derivative action against the appellees seeking, in Count I, damages for negligently breaching the duty of care owed to all members of Magic; in Count II, damages for breaching a fiduciary duty owed to Magic and its members; and, in Count III, an accounting.
In September 2012, appellees filed their motion for summary judgment and supporting affidavit. In February 2013, appellants filed a memorandum in opposition to the motion for summary judgment and supporting affidavit. In appellants’ memorandum in opposition, appellants withdrew their negligence claim (Count I) and their claims related to misconduct occurring pri- or to the adoption of the amended operating agreement.
On April 8, 2013, the trial court entered the order granting summary final judgment in favor of the appellees. The trial court concluded that there was no genuine issue of material fact and that, as a matter of law: (1) appellees did not violate the duty of loyalty imposed by section 608.4225, Florida Statutes, and the operating agreement; (2) appellees did not commit “willful misconduct” in violation of their fiduciary duties; (3) Durden was immune from personal liability because the Magic board, of which he was a member, appointed him as CEO of the company, in which capacity he committed the tortious acts; and (4) lenders (DEI and DE2) could not be liable for breach of fiduciary duties. This appeal ensued.

Fiduciwy Duty

Under Florida’s common law, the Florida Supreme Court has defined the concept of fiduciary duties broadly reflecting its historical origin in equity. In Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927), a case involving allegations that a real estate broker had violated his fiduciary duty, the Court explained the basis of the duty:
The term ‘fiduciary or confidential relation,’ is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused — in which confidence has been reposed and betrayed. The origin of the confidence is immaterial. The rule embraces both technical fiduciary relations and those *403 informal relations which exist wherever one man trusts in and relies upon another.
[[Image here]]
Stripped of all embellishing verbiage, it may be confidently asserted that every instance in which a confidential or fiduciary relation in fact is shown to exist will be interpreted as such. The relation and duties involved need not be legal; they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief. The origin of the confidence is immaterial.
Id. at 420-21; see also Doe v. Evans, 814 So.2d 370, 374 (Fla.2002) (quoting Restatement (Second) of Torts § 874 cmt. a) (“A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation.”).
As early as 1907, the Court recognized that under the Florida common law a director was in a fiduciary relationship with the corporation. See Jacksonville Cigar Co. v. Dozier, 53 Fla. 1059, 1065-68, 43 So. 523, 525 (1907). Other early Florida cases described the relationship between a corporation and its directors and officers as involving:
a quasi fiduciary relation to the corporation and its stockholders.... They are required to act in the utmost good faith, and in accepting the office they impliedly undertake to give to the enterprise the benefit of their best care and judgment, and to exercise the powers conferred solely in the interest of the corporation.
Orlando Orange Groves Co. v. Hale, 107 Fla. 304, 313-14, 144 So. 674, 677 (1932) (citations omitted). Florida courts have continued to describe the duties of a director and an officer to the corporation as arising from trust and equity concepts. In Snead v. U.S. Trucking Corp., 380 So.2d 1075, 1078-79 (Fla. 1st DCA 1980), we explained:
A director’s duties being trust duties or in the nature of the duties of a trustee toward his cestui que trust, his acts are subject to be tested by the rules governing the relation of a trustee to his cestui que trust.... He is bound to act with fidelity, the utmost good faith, and with his private and personal interests subordinated to his trust duty whenever the two come in conflict. Courts of equity must enforce strict compliance with these rules.
(citation omitted).
In short, Florida courts have recognized that corporate officers and directors owe both a duty of loyalty and a duty of care to the corporation that they serve. See Cohen v. Hattaway, 595 So.2d 105 (Fla. 5th DCA 1992); B & J Holding Corp. v. Weiss, 353 So.2d 141 (Fla. 3d DCA 1978).[4]
Although unrelated to fiduciary duty concepts, Florida courts have also *404 recognized that “[e]very contract includes not only its written provisions, but also the terms and matters which, though not actually expressed, are implied by law, and these are as binding as the terms which are actually written or spoken.” First Nationwide Bank v. Florida Software Servs., Inc., 770 F.Supp. 1537, 1542 (M.D.Fla. 1991). One of the implied contract terms recognized in Florida law is the implied covenant of good faith, fair dealing, and commercial reasonableness. Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1097 (Fla. 1st DCA 1999); see also Schech v. Burger King Corp., 798 F.Supp. 692, 700 (S.D.Fla.1992); First Nationwide Bank, 770 F.Supp. at 1542; Green Companies, Inc. v. Kendall Racquetball Invs., Ltd., 560 So.2d 1208, 1210 (Fla. 3d DCA 1990); Fernandez v. Vazquez, 397 So.2d 1171, 1173-74 (Fla. 3d DCA 1981). This implied covenant arises because “[a] contract is an agreement whereby each party promises to perform their part of the bargain in good faith, and expects the other party to do the same.” First Nationwide Bank, 770 F.Supp. at 1544. Thus, the implied covenant of good faith and fair dealing is designed to protect the contracting parties’ reasonable expectations. Cox, 732 So.2d at 1097.
Cox described the covenant as a constraint upon the discretion granted to one party under the terms of the contract. Id. at 1097-98.
Thus, where the terms of the contract afford a party substantial discretion to promote that party’s self-interest, the duty to act in good faith nevertheless limits that party’s ability to act capriciously to contravene the reasonable contractual expectations of the other party.
Id. Although.the covenant arises from a contract, the implied covenant of good faith and fair dealing cannot be used to vary the express terms of a contract. Id. at 1098; see also Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc., 188 Fed.Appx. 966 (11th Cir.2006).

The LLC Act

The LLC Act has codified the law of fiduciary duties in an LLC. Under section 608.4225(1), Florida Statutes (2011),
[s]ubject to ss. 608.4226 and 608.423, each manager and managing member shall owe a duty of loyalty and a duty of care to the limited liability company and all of the members of the limited liability company.
The LLC Act has restricted the duty of loyalty, however. Under subsection 1(a) of section 608.4225,
[s]ubject to s. 608.4226, the duty of loyalty is limited to:
1. Accounting to the limited liability company and holding as trustee for the limited liability company any property, profit, or benefit derived by such manager or managing member in the conduct or winding up of the limited liability company business or derived from a use by such manager or managing member of limited liability company property, including the appropriation of a limited liability company opportunity.
2. Refraining from dealing with the limited liability company in the conduct or winding up of the limited liability company business as or on behalf of a party having an interest adverse to the limited liability company.
3. Refraining from competing with the limited liability company in the conduct of the limited liability company business before the dissolution of the limited liability company.
Section 608.4225(l)(b) also limits the duty of care to refraining from engaging in *405 grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. Section 608.4225(l)(c) incorporates the concepts of good faith and fair dealing by requiring that each manager and managing member discharge the duties to the LLC and its members under chapter 608 or under the articles of organization or operating agreement and exercise any rights “consistent with the obligation of good faith and fair dealing.”
Section 608.4226 addresses conflicts of interest transactions, which it defines in subsection (1) as a:
contract or other transaction between a limited liability company and one or more of its members, managers, or managing members or any other limited liability company, corporation, firm, association, or entity in which one or more of its members, managers, or managing members are managers, managing members, directors, or officers or are financially interested.
A conflict of interest is not “either void or voidable because of such relationship” if:
(a) The fact of such relationship or interest is disclosed or known to the managers or managing members or committee which authorizes, approves, or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested members, managers, or managing members;
(b) The fact of such relationship or interest is disclosed or known to the members entitled to vote and they authorize, approve, or ratify such contract or transaction by vote or written consent; or
(c) The contract or transaction is fair and reasonable as to the limited liability company at the time it is authorized by the managers, managing members, a committee, or the members.
Thus, under section 608.423, members of an LLC can enter into an operating agreement to “establish duties in addition to those set forth in [chapter 608], and to govern relations among the members, managers, and company.” § 608.423(1), Fla. Stat. (2011). Nevertheless, under section 608.423 an operating agreement may not:
(a) Unreasonably restrict a right to information or access to records under s. 608.4101;
(b) Eliminate the duty of loyalty under s. 608.4225, but the agreement may:
1. Identify specific types or categories of activities that do not violate the duty of loyalty, if not manifestly unreasonable; and
2. Specify the number or percentage of members or disinterested managers that may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty;
(c) Unreasonably reduce the duty of care under s. 608.4225;
(d) Eliminate the obligation of good faith and fair dealing under s. 608.4225, but the operating agreement may determine the standards by which the performance of the obligation is to be measured, if the standards are not manifestly unreasonable[.]

The Magic Operating Agreement

Pursuant to section 608.423, the parties entered into an operating agreement which modified the fiduciary duties applicable to Magic. The operating agreement gives effect to the LLC Act and provides guideposts for measuring the conduct of the parties. For example, paragraph 5.4 of the operating agreement generally provides that “[t]he Manager shall exercise the powers granted hereby in a *406 fiduciary capacity and in the best interests of the Company and its Subsidiaries.” Nevertheless, paragraph 5.6(a) of the operating agreement provides:
Except as otherwise provided herein, ... no present or former Manager nor any such Manager’s Affiliates, officers, directors, employees, agents or representatives shall be liable to the Company ... for any act or omission performed or omitted by such Person in his, her or its capacity as Manager; provided that ... such limitation of liability shall not apply to the extent the act or omission was attributable to such Person’s willful misconduct or knowing violation of law.
Paragraph 5.6(b) also allows broad discretion to the board:
At such time as the Board is the Manager, whenever in this Agreement ... the Board is permitted or required to take any action or to make a decision or determination, the Board shall take such action or make such decision or determination in its sole discretion, unless another standard is expressly set forth herein....
Section 5.6(c) of the operating agreement sets forth a complex assortment of waivers, acknowledgements, and agreements relating to conflicts of interest and breaches of the duty of care and duty of loyalty. As for a waiver, section 5.6(c) provides that, to the maximum extent permitted by the LLC Act, Magic and each member of Magic waive any claim against each manager and member of Magic and their affiliates for breach of any fiduciary duty to Magic or its members, including claims as may result from a conflict of interest among Magic, the managers, and the members. Further, in section 5.6(c) each member agrees that “in the event of any such conflict of interest, each such Person may act in the best interests of such Person or its Affiliates, employees, agents and representatives.”
In addition, in section 5.6(c):
The Members agree (i) that the standard of duty of care and duty of loyalty, as well as the obligations of good faith and fair dealing, required under the Act will be satisfied so long as a Manager or Member believes that the terms of any contract or transaction giving rise to a conflict of interest were not unfair or unreasonable to the Company, (ii) the rights and interests of all other parties in interest may be taken into account in discharging such duties and obligations, including Members and their Affiliates who may be creditors or employees of the Company or persons contracting therewith, and (iii) that this standard is not unreasonable and otheiiuise complies with Section 608.^23 of the Act.
(emphasis added).
Finally, this section sets forth an example of the type of conflict of interest transaction contemplated by the parties:
By way of example only, in the event the Board were considering two alternative proposals for an Approved Sale, the Board could consider, among other things, such facts as the Company’s state of affairs and financial status, contingencies present in competing proposals, the identities, reputation and financial soundness of other parties to the proposed transaction, the rights and in-tei*ests of the other parties to the proposed transaction (including Affiliates of the Manager or Member), the relative uncertainties of the competing proposals, the nature of the consideration offered in the competing proposals, and any other facts as the Board deems relevant in its sole discretion, and could reasonably conclude that a competing proposal offering less consideration was in the best interest of the Company and *407 should be an Approved Sale, notwithstanding that certain Classes of Members might benefit less, if at all, from the Approved Sale relative to the benefit such Classes would have received from an alternative competing proposal(s).
Paragraph 5.6(c) also seeks to identify types of conflict of interest transactions that do not violate the duty of care, duty of loyalty, and obligations of good faith and fair dealing under the LLC Act. It expressly provides that those standards will be deemed to be satisfied so long as a Manager or Member believes that the terms of any conflict of interest transaction “were not unfair or unreasonable to the Company ...” and that “this standard is not unreasonable and otherwise complies with section 608.423 of the Act.”

Summary Judgment

We review orders granting summary judgment de novo. Dianne v. Wingate, 84 So.3d 427, 429 (Fla. 1st DCA 2012). The court’s “task is to determine whether, after reviewing every inference in favor of [a]p-pellants as the non-moving party, no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law.” Id. “If there is even the slightest doubt that material factual issues remain, summary judgment may not be entered.” Alpha Data Corp. v. HX5, L.L.C., 139 So.3d 907, 910 (Fla. 1st DCA 2013). As we have previously instructed:
A summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law.... If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it.
Feizi v. Dep’t of Mgmt. Servs., 988 So.2d 1192, 1193 (Fla. 1st DCA 2008) (quoting Moore v. Morris, 475 So.2d 666, 668 (Fla.1985)).
We hold disputed issues of material fact remain concerning whether appellees engaged in “willful misconduct” under the operating agreement. We agree with appellants that the trial court either weighed the evidence or summarily drew its own inferences from the evidence by finding as a matter of law and fact that no “willful misconduct” had been committed. Thus, the trial court subjugated the role of the jury to determine issues of fact as to the commission of “willful misconduct.” See Taylor v. Wellington Station Condo. Ass'n, Inc., 633 So.2d 43, 44 (Fla. 5th DCA 1994) (stating “[sjince the Association’s motion and complaint requested a finding that Taylor was liable to the Association for willfully breaching his fiduciary duty, the trial court would necessarily have to make a finding that Taylor acted with intent in order to grant the motion.”) (emphasis in original).
REVERSED and REMANDED for further proceedings consistent with this opinion.
WOLF, J., concurs, and MARSTILLER, J., dissents with opinion.

. Appellees have not challenged appellants’ ability to bring this action as a derivative action. See Dinuro Invs., LLC v. Camacho, 141 So.3d 731 (Fla. 3d DCA 2014).

. In 2013, the LLC Act was substantially revised. See Laws of Fla. 2013, ch. 2013-180, § 2; sections 605.0101-605.1108, Fla. Stat. (2014). The Revised LLC Act is effective January 1, 2015, and has no application to the case under review.

. It is undisputed that all claims arising prior to the date of the amended operating agreement are waived by the members of Magic pursuant to the amended operating agreement.

. The Florida common law concept of fiduciary duty is similar to Justice Cardozo’s description of fiduciary duty in Meinhard v. Salmon, 249 N.Y. 458, 463-64, 164 N.E. 545, 546 (1928).
Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.