**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 24-12638

————————————

THE LANE CONSTRUCTION CORPORATION,
   a Connecticut corporation,

*Plaintiff-Counter Defendant*
*Cross Defendant-Appellant,*

*versus*

SKANSKA USA CIVIL SOUTHEAST, INC.,
   a Virginia corporation,

*Defendant-Counter Claimant-Appellee,*

GRANITE CONSTRUCTION COMPANY,

*Intervenor Defendant-Counter Claimant-Appellee,*

SALINI IMPREGILO S.P.A.

*Counter Defendant,*

WEBUILD S.P.A. INC.,
   f.k.a. Salini Impregilo S.P.A., Inc.,

*Counter Defendant-Appellant,*

SKANSKA-GRANITE-LANE, A JOINT VENTURE,

*Counter Defendant-Cross Claimant-Appellee.*

————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-00164-RBD-DCI

————————————

Before NEWSOM, BRASHER, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Not all ventures strike gold; some strike sinkholes. Such was the case for a private group of contractors who shouldered Florida's largest and most expensive construction project to date.

The task was to expand and revamp Florida's Interstate 4 highway ("I-4"), which runs between Tampa and Daytona Beach. Three contractors—Skanska USA Civil Southeast, Inc. ("Skanska"), Granite Construction Company ("Granite"), and The Lane Construction Company ("Lane")—formed a joint venture ("SGL") to take on the job. SGL secured a winning bid of $2.3 billion, projecting some $255 million in profit. But hurricanes, inflation, a labor shortage, and a series of unfortunate events turned profit-seeking into loss-mitigation. SGL soon found itself more than half a billion dollars in the red.

A few years into the project, Lane pitched the idea of ditching construction altogether. Lane knew SGL had no right to abandon ship, but its lawyers claimed they had concocted a legal theory to escape without liability. Alternatively, Lane and its lawyers

suggested SGL threaten to walk away as a negotiation tactic. Either option would put a stop to the bleeding, or so Lane argued.

Skanska found it too risky. Lane's proposal rested on a series of tenuous legal assumptions, and if even one failed, SGL could face uncapped damages. Successful or not, the reputational damage would be untold. But to Lane, Skanska's concern was a mere façade overlaying an odious conflict of interest. Skanska's sister company was financing the construction in exchange for milestone payments and an exclusive maintenance agreement worth $75 million a year. Lane surmised that Skanska's parent company stood to lose more from jeopardizing those payments than it would gain from stemming SGL's losses.

Lane cried foul. It sued Skanska for breach of fiduciary duty and began refusing mandatory capital calls. Skanska and Granite countersued for breach of contract. After a ten-day bench trial, the District Court found that Skanska exhibited no dual loyalty and acted in the best interest of SGL. It ordered Lane to pay $80 million for refusing to fund the venture while litigation pended. We affirm.

## I. BACKGROUND

In 2013, the Florida Department of Transportation ("FDOT") solicited bids for what would become the most expensive construction endeavor in state history. Dubbed the "I-4 Ultimate Project," the plan was to reconstruct and double the width of a twenty-one-mile stretch of I-4 spanning seventy-two bridges and fifteen interchanges. It would rise or fall on the competency and coordination of several major stakeholders.

## A. I-4 Ultimate Project Structure

Unlike the traditional model, where the government solicits bids and enters construction contracts directly, the I-4 Ultimate Project was structured as a public–private partnership ("P3 Model"). This meant that a private concessionaire, I-4 Mobility Partners OpCo LLC ("I4MP"), would finance the project and assume legal responsibility for its completion. Pursuant to a concession agreement, I4MP agreed to provide funding, secure contractors, and follow FDOT's specifications. In return, I4MP would receive milestone payments from FDOT and a forty-year exclusive agreement to maintain I-4, valued around $75 million per year. Following a competitive bid process, SGL was selected as the contractor to undertake all necessary construction for the I-4 Ultimate Project.

SGL was organized as a Florida unincorporated joint venture pursuant to a Joint Venture Agreement ("JVA") dated June 3, 2014. Skanska was named SGL's "Managing Party," and the parties maintained the following stakes in the venture: Skanska (40%), Granite (30%), and Lane (30%). The JVA established an "Executive Committee," which was comprised of one representative from each party. Most decisions required unanimous consent from the Executive Committee, but certain time-sensitive matters could be addressed unilaterally by Skanska.

After it was selected to construct the I-4 Ultimate Project, SGL entered into a Design Build Agreement ("DBA") with I4MP. At a high level, the DBA required SGL to complete the project in

24-12638                Opinion of the Court                5

six years for $2.3 billion, the quote from its winning bid. If SGL completed the project late, it would owe liquidated damages, and if SGL abandoned the project, it could face uncapped liability. Thus, while I4MP was legally responsible for ensuring the project's completion, the brunt of the financial risk was actually borne by SGL.

The alleged conflict of interest, which gave rise to this litigation, emanates from the overlapping ownership of Skanska and I4MP. Skanska was owned by Skanska USA, Inc. ("Skanska USA"), and ultimately by Skanska AB. I4MP was owned by Skanska Infrastructure Development, Inc. ("Skanska ID") (50%), and John Laing Investments Limited (50%). Skanska ID, in turn, was owned by Skanska AB—*the same ultimate parent of Skanska.* This meant that Skanska AB had a stake in both SGL and I4MP, which sat on opposite sides of the DBA.

The fact that Skanska and I4MP shared a common parent was not hidden from the other members of SGL. Lane and Granite received a comprehensive organizational structure chart more than a year before the execution of SGL's JVA.[1] The record reveals that it is quite typical among P3 ventures for a concessionaire to have a stake in the construction syndicate. Moreover, Skanska, Granite, and Lane had worked together on several P3 Model projects before the I-4 Ultimate Project began.

---

[1] That structure chart is attached as Appendix A to this Opinion.

Lane concedes that it was aware of the project structure from the beginning. It also concedes that the structure did not *ipso facto* create a conflict of interest, but rather that "the relationship presented the possibility of conflict." Appellant's Reply Br. 11. The deal's basic economics confirm this assessment. As long as the project went smoothly, SGL would profit from the DBA, while I4MP would meet its obligations to FDOT and see a return on investment. Only if things took a turn for the worse might SGL and I4MP's interests diverge.

### B. Delays, Rising Costs, and Conflict

Construction on the I-4 Ultimate Project began in 2015. From the beginning, almost nothing went according to plan. A labor shortage and geological hazards spawned massive delays and unforeseen expenses. Broader economic conditions deteriorated, causing material costs to rise. Hurricanes Irma and Matthew offered no respite.

The parties did not get along swimmingly. Shortly after construction began, Lane's parent company was acquired by Italian construction firm WeBuild S.p.A. Inc. ("WeBuild"), something that Skanska claims exacerbated tensions. Lane became increasingly aggressive towards the other SGL members, and, as losses mounted, the parties' relationship worsened. Even Lane's then-CEO, Robert Alger, acknowledged that some WeBuild executives were "hothead[s]" and that WeBuild "had a different culture" than Lane. In an internal email, Alger described WeBuild's corporate strategy as "woeful" and "disgusting."

By 2018, SGL's projected profit of $255 million turned into a projected loss of $108 million. There was no end in sight, and by the time trial began in 2023, SGL's losses had ballooned to over $500 million. Alger described it as "almost unheard of in the United States," noting "[p]eople don't lose money like that."

The single largest problem occurred when SGL drilled into a sinkhole so large it "couldn't find the bottom." The sinkhole was located at the proposed site for a bridge deemed by Lane to be "the most critical item on the critical path." SGL assessed the issue at $48 million and predicted a 245-day delay.

To clarify the earlier point about risk allocation, the DBA did not leave SGL with *no recourse* in the face of unforeseen expenses. SGL had a process to obtain additional funds from FDOT, but that process involved several steps. First, SGL would have to submit an "Equivalent Claim Notice" to I4MP, where it would assert that I4MP has a right to obtain money from FDOT under the concession agreement. Second, I4MP would have to agree that the claim was legitimate and not "false or frivolous" or "based on defective cost and pricing data." Finally, I4MP would have to submit the claim to FDOT as a qualifying "Relief Event," and FDOT would have to approve the claim.

In the early stages of construction, SGL relied heavily on Equivalent Claim Notices to get deadline extensions and more funding. In May 2018, SGL submitted an Equivalent Claim Notice for the sinkhole issue, seeking $48 million and an additional 245

days to complete the project. I4MP reviewed and submitted the claim to FDOT, along with its own request for $50 million.[2]

### C. The "Termination Request"

Realizing that payments for covered Relief Events would only scratch the surface of its losses, SGL began looking for a way out. For that, SGL turned to outside counsel at Holland & Knight, who reviewed the material contracts and prepared a memorandum. It was largely unavailing. Holland & Knight found that SGL had no termination rights under the DBA. In fact, § 20.2 of the DBA expressly provided that "in no event may [SGL] terminate" the DBA due to delay-causing Relief Events. And although I4MP could potentially terminate the *concession agreement* for extended project delays, "the decision to terminate the DBA or require SGL to continue to fully perform pursuant to the DBA's terms and conditions rest[ed] solely with FDOT."

Unwilling to put the idea to rest, SGL asked Holland & Knight to keep looking. Its second memorandum explored the concession agreement's termination clause further. It explained that I4MP could conditionally terminate the concession agreement with FDOT if qualifying Relief Events would delay the project by

---

[2] I4MP had a contractual right to seek compensation for both itself and SGL when Relief Events stood to delay the project. Delays hurt I4MP because FDOT would not send its largest payment to I4MP until the project was "substantially" complete. Until that point, I4MP would need to keep borrowing and paying interest to its lenders.

at least 180 days.[3] Holland & Knight reiterated that this was *I4MP's* right under the concession agreement—to which SGL was not a party[4]—and that termination would not necessarily impact the DBA. Rather, it would give FDOT the option to either (1) terminate the DBA; or (2) step into I4MP's shoes with respect to the DBA ("Step-in Rights"). Option two would leave SGL exactly where it started, and with an angrier FDOT.

Nevertheless, the memorandum offered a potential avenue for SGL to coerce I4MP into invoking its termination rights. It explained that the DBA's Equivalent Claim provision required I4MP to "in good faith use reasonable efforts to enforce its rights, entitlements, [and] remedies" under the concession agreement "for the benefit of [SGL]." Thus, the memorandum reasoned, if SGL submitted an Equivalent Claim Notice requesting that I4MP invoke its termination rights (the "Termination Request"), "I4MP would arguably have to comply, or run the risk of being liable to SGL." Alternatively, "SGL could use [the Termination Request] as leverage to attempt to renegotiate terms . . . that would ultimately benefit both I4MP and SGL."

Holland & Knight's memorandum came with caveats. It was expressly "predicated on the assumption that SGL [could] timely and irrefutably plead and prove entitlement in excess of 180

---

[3] This provision served as a counterweight to § 10.2, which capped FDOT's obligation to reimburse I4MP for losses associated with delays exceeding 180 days.

[4] The only parties to the concession agreement were FDOT and I4MP.

Relief Event days." It also warned that I4MP would likely take a different reading of the DBA and that "I4MP could refuse any request to terminate," launching the parties into dispute resolution.

Intrigued, SGL sought advice from a second outside law firm, VLP. VLP threw a wrench into the plan, explaining that I4MP likely could not terminate the concession agreement until the project had already been delayed for 180 days, rather than when it predicted such a delay. Additionally, VLP explained that the Termination Request would have "serious consequences," might "push FDOT into self-preservation mode," could lead to "protracted litigation," and should be "a remedy of last resort."

In August 2018, Holland & Knight drafted a third memorandum. It piled on the warnings, reiterating that the Termination Request, even if passed along to FDOT, would not "actually terminate[] the DBA in any way." It agreed with VLP that FDOT and I4MP could challenge SGL's request on multiple grounds and spark costly litigation.

### D. SGL's Meeting in NYC

On October 9, 2018, SGL met in New York City to evaluate its options. The meeting was attended by SGL's Executive Committee, Holland & Knight, each member's respective counsel, and various other executives. Lane's outside counsel, Michael McNamara of Pillsbury Winthrop Shaw Pittman LLP, began by presenting in favor of the Termination Request. Alger thought that, in light of the dire circumstances, the presentation would be

a slam dunk: "I thought it would be hands down, we'd be going out, having a beer afterwards."

To Lane's surprise, the presentation was poorly received. McNamara's legal theory proved more grandiose than that of Holland & Knight's highly cautioned memoranda. McNamara purported to have a solution not only to force termination of the concession agreement, but also to guarantee SGL relief from its DBA obligations. He relied heavily on the following provision in the DBA, extracted from the nearly 200-page agreement. The provision explained what would happen if the concession agreement were terminated and FDOT exercised its Step-in Rights:

> If . . . FDOT has elected to continue this Agreement, then [SGL] shall execute and deliver to FDOT a written assignment . . . of all [SGL]'s right, title and interest in and to this Agreement, and *Concessionaire*[5] *shall assume in writing* [SGL]*'s obligations thereunder* that arise from and after the later of the Termination Date or the effective date of assignment.

DBA § 20.6.3.1 (emphasis added).

According to McNamara, this provision (the "Assignment Provision") meant that, upon termination of the concession agreement and FDOT's election to continue the DBA, I4MP would assume SGL's construction obligations, and SGL would be home free. To most in the room, however, this was nonsensical. If construed literally, the Assignment Provision would require I4MP, a

---

[5] I4MP is referred to as "Concessionaire" in the DBA.

special purpose vehicle, to build the project on its own nickel and then pay FDOT what remained of the $2.3 billion bid price.[6] Skanska USA General Counsel Michael DiPaolo explained that the provision "didn't make any sense" and "had to be a typo."

Lane had promised in advance of the meeting to accompany its presentation with a white paper, fully explaining the logic behind its proposal. But it was not ready on time, which only invited more skepticism. After finishing his presentation, McNamara "quickly exited" to "catch a flight." DiPaolo recounted the meeting at trial:

> I thought [it] was very odd. He just gave a presentation that literally was, you know, a bomb being dropped in the room. . . . [T]hat's the nuclear option. And he didn't stick around for any questions. We didn't get a white paper we were promised beforehand. And I don't think we got the PowerPoint that day either.

After McNamara left, WeBuild executive Ignacio Botella continued to press the issue. He called on the group to "immediately" execute the Termination Request. "[F]irst you put the knife to the throat and then you negotiate," he explained. Botella noticed that the body language of certain Skanska executives showed "real concern," which—he inferred—reflected their "clear conflict of

---

[6] Specifically, it would require SGL to assign its rights in the DBA to FDOT (i.e., its rights to receive payment from I4MP) and require I4MP to assume all of SGL's obligations under the DBA (i.e., the construction).

interest."

Skanska USA CEO Richard Kennedy explained that he "didn't feel that a compelling case had been made around termination" but that he had not reached a "final position." Alger replied: "You're looking at it from Skanska as a whole that could walk away with $150 million," meanwhile "Lane is going to lose $160 million." Kennedy objected, explaining that Skanska's "dual stake" was "a strength" rather than a conflict.

Notwithstanding the skirmish between Lane and Skanska, the meeting was described as productive and not overly hostile. The parties agreed to continue evaluating the Termination Request but also to move forward by civilly negotiating with FDOT about existing Relief Event claims and exploring other solutions.

A week after the meeting, Lane followed up with its white paper. There, McNamara wrote that the Termination Request was "the best contractual tool that SGL has at its disposal" to mitigate huge losses. Regarding the Assignment Provision, he acknowledged "I4MP will probably argue that it was not the intent of the [DBA] to have I4MP take over SGL's obligations . . . and that it makes no commercial sense to have the agreement operate this way." But he reasoned that the contract would not have accidentally included such an important provision and that the plain text would win the day. McNamara also conceded that SGL would have to complete the project while the matter was litigated but that "this scenario would leave SGL in no worse a position than it is currently in."

14                  Opinion of the Court              24-12638

In response, Holland & Knight conducted its most thorough analysis to date. It offered a scathing rebuke of McNamara's work, calling several of his positions "unsupportable" and explaining that "it would be reckless" to pursue the Termination Request. It also did some digging to understand the bizarre Assignment Provision. Holland & Knight tracked down the DBA's drafting attorney, who confirmed that the Assignment Provision "contain[ed] a scrivener's error" and explained that "any argument . . . that SGL is replaced by I4MP upon assignment of FDOT is unsupported by the DBA and [the concession agreement] (and Florida law), especially when the contracts are read as a whole." The drafting attorney provided the following correction:

> If . . . FDOT has elected to continue this Agreement, then [~~SGL~~] **Concessionaire** shall execute and deliver to FDOT a written assignment . . . of all [~~SGL~~]~~'s~~ **Concessionaire's** right, title and interest in and to this Agreement, and ~~Concessionaire~~ **FDOT** shall assume in writing [~~SGL~~]~~'s~~ **Concessionaire's** obligations ~~thereunder~~ **hereunder** that arise from and after the later of the Termination Date or the effective date of assignment.

As intended, the Assignment Provision was to do no more than effectuate FDOT's Step-in Rights, i.e., its ability to take over the DBA and force SGL to stay on the job. It was not Lane's get-out-of-jail-free card; in fact, it was just the opposite. Holland & Knight explained that any Florida court would look beyond the typos to read the contract as a whole, and "that unless FDOT voluntarily elect[ed] to terminate the DBA . . . SGL [would] remain

responsible" for the construction. It concluded that it was "extremely unlikely" that the Termination Request would have the desired outcome.

### E. SGL Rejects Termination; Lane Stops Cooperating

By January 2019, termination appeared to be "put on the back burner or even dead." Efforts quickly turned to identifying a commercial resolution with FDOT. Skanska CEO Don Fusco led negotiations, and Lane actively participated. As time ticked on, however, SGL continued suffering millions in monthly losses and needed major cash infusions to stay liquid. Meanwhile, WeBuild executives were forcing Lane to withhold mandatory capital contributions until SGL secured a major settlement or forced termination.

In July 2019, SGL was nearing a $125 million settlement with FDOT, under which SGL would retain its right to pursue future claims for relief. With a favorable deal on the horizon, Skanska and Granite expected Lane to be a team player and honor the capital calls. Meeting in person, Alger promised he would do just that. But Alger was not calling the shots. He later texted Fusco: "I am not authorized to agree to what we discussed and need to ask for an extension until the end of August as this decision has to be made by Salini[7] himself who is out until then."

Mr. Salini was unimpressed. In October 2019, Lane and WeBuild formally refused to back the settlement and demanded

---

[7] Pietro Salini was a partial owner of Salini-Impregilo, now known as WeBuild.

that SGL seek termination. A conference call ensued, where Skanska executives reminded Lane that it had previously supported the material terms of the settlement and that sending the Termination Request now would blow up the deal. Lane demanded an immediate vote on whether to terminate. Skanska and Granite refused, explaining they would need more time and a good reason to override the advice of SGL's counsel. The call ended abruptly, with the parties at an impasse.

A final deal with FDOT was executed on April 10, 2020. SGL's vote was 2:1, with Skanska and Granite voting in favor and Lane objecting. Unable to act unanimously, Skanska exercised its unilateral authority under the JVA. The deal required FDOT to pay SGL $125 million and extend the project deadline by one year. SGL retained the right to pursue future relief, and FDOT agreed to dramatically limit SGL's exposure to liquidated damages. Of course, SGL waived its right to request termination, meaning the I-4 Ultimate Project would forge ahead—with or without Lane's cooperation.

Lane fulfilled several capital calls in the months that followed. At the end of the year, the parties discussed the need for another large cash contribution. Lane seemed to agree on the need for more funding, and after the meeting, Lane's own employee was the one to circulate a draft $21 million "Working Capital Request" with the Executive Committee. Skanska and Granite quickly approved, and Jose Penalver, Lane's Executive Committee representative, wrote: "I review [sic] it and it looks ok to me." Skanska

issued the call the next day, with a payment deadline of January 11, 2021 (the "January 2021 Call"). Rather than pay, Lane decided it was time to take matters to court.

## F. District Court Proceedings

On January 22, 2021, Lane sued Skanska in the United States District Court for the Middle District of Florida. Lane's complaint had three counts:

- Count One: Skanska breached its fiduciary duties of loyalty and care by "refusing to consider pursuing and then failing to exercise [the Termination Request] in order to benefit the financial, business reputation, and other interests of [I4MP] and [Skanska AB]." Lane Comp. ¶ 67.

- Count Two: Skanska committed gross negligence by rejecting the Termination Request and by "manag[ing] its affairs in the best interests of itself and its owner to the detriment of SGL . . . and to SGL's non-managing members." Lane Comp. ¶ 75.

- Count Three: "As a consequence of" the actions alleged in Counts One and Two, "Lane is entitled to a declaratory judgment that Lane is not obligated to make any further capital contributions to SGL." Lane Comp. ¶¶ 81, 84.

Lane had no interest in funding SGL while awaiting the District Court's disposition on Count Three. In a letter sent to Skanska with a copy of its complaint, Lane told Skanska that its "actions and inactions constitute[d] an ongoing and material breach of the [JVA]

that relieve[d] Lane of its obligation to continue performance." The letter emphasized that Lane would "not make any further capital contributions starting with the January 2021 Cash Call."

Lane, over warnings from its in-house counsel, stuck to its word. By August 2021, Lane's unpaid proportionate share of capital contributions had accrued to nearly $60 million. The "S" and "G" of SGL had to make up the difference to keep the project afloat. Skanska countersued Lane for breach of contract and indemnity, seeking reimbursement for its excess funding of SGL, plus damages, interest, and attorneys' fees. With leave of the court to intervene, Granite did the same.

After extensive discovery, the parties filed for summary judgment. The District Court ruled for Skanska and Granite on their counterclaims, finding that "Lane's refusal to pay the capital calls materially breached the JVA" even if Skanska breached its fiduciary duty because the "contract and fiduciary claims are different animals."[8] The Court further found that Skanska and Granite were entitled to contractual indemnity relating to Lane's breach. The District Court, however, denied summary judgment on Lane's Count One and Two (breach of fiduciary duty and gross negligence). Those issues, along with a calculation of damages arising from the contract claims, would proceed to trial.

---

[8] Having concluded that Lane was obligated to pay SGL's capital calls, the District Court dismissed Lane's Count Three.

In October 2023, the District Court presided over a ten-day bench trial. It issued a fact-intensive, forty-page opinion that fully absolved Skanska of any wrongdoing. The evidence "firmly estab-lishe[d]" that Skanska neither breached its fiduciary duties nor acted with gross negligence. The Court found that Skanska acted "in the best interest" of both Lane and SGL by rejecting the Termi-nation Request. Choosing to negotiate rather than send the Termi-nation Request was "a no-brainer, not a breach," the Court wrote. And even if there was a breach, Lane's alleged damages were far too speculative.

As for Lane's breach of contract, the Court ordered Lane to pay $49 million to Skanska and $30 million to Granite—the amounts needed to balance the parties' proportionate obligations to fund SGL. The Court imposed prejudgment interest[9] under Flor-ida's statutory rate and allowed Skanska and Granite to seek attor-neys' fees. Lane appeals.

Our analysis proceeds as follows. First, we review the Dis-trict Court's resolution to Skanska and Granite's contract claims, including the Court's ruling on indemnity and its application of prejudgment interest. We find no error. We next review the Court's conclusions of law and fact after trial. Although we affirm the Court's ultimate conclusion that Skanska did not breach its fi-duciary duties, we offer some commentary on the Court's

---

[9] The Court afforded Skanska and Granite approximately $7.5 million and $6 million in prejudgment interest, respectively. Post-judgment interest is set to accrue at the rate set forth in 28 U.S.C. § 1961(a).

application of Florida partnership law to highlight an unanswered question for the Florida Supreme Court. We conclude with a brief discussion on remedies and speculative damages.

## II. BREACH OF CONTRACT

We begin by reviewing the District Court's grant of summary judgment in favor of Skanska and Granite on their claims for breach of contract and indemnity. Our review is de novo. *See Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1351 (11th Cir. 2024). Like the District Court, we review evidence in the light most favorable to Lane and construe all reasonable inferences in its favor. *Jenkins v. Nell*, 26 F.4th 1242, 1249 (11th Cir. 2022).

### A. Lane Materially Breached the JVA

"An adequately pled breach of contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages." *Friedman v. New York Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008). Here, the simple question is whether Lane breached the JVA by refusing to pay capital calls to SGL after December 2020. Lane admits it stopped paying. And, while it once argued that Skanska's breach of fiduciary duty discharged its obligation to fund SGL, Lane abandons this argument on appeal.[10] Lane's only remaining argument is that the calls, beginning with the January 2021 Call, were unauthorized and/or procedurally defective.

---

[10] In any event, that argument would fail because, in Part III *infra*, we hold that Skanska committed no such breach.

That argument goes as follows. SGL had two methods of calling capital: (1) by unanimous consent of the Executive Committee, under JVA § 7.1; and (2) by Skanska unilaterally, under JVA § 4.3(b). If Skanska opted to act unilaterally under § 4.3(b), it had to provide written notice and identify a specific justification for doing so.[11] Dissenting partners would then be free to challenge Skanska's justification under § 7.2. Proper authorization was necessary—indeed, a condition precedent—for any call to be binding on Lane.

And, Lane continues, the calls in question failed to comply. The January 2021 Call was not unanimous because Penalver's "I review [sic] it and it looks ok to me" email was a preliminary, informal statement. Nor was it a § 4.3(b) call because Skanska failed to formally invoke its unilateral authority. Had it done so, Lane would have been entitled to challenge the call under § 7.2. The same goes for the calls after January. They certainly were not unanimous because Lane rebuked any future payment obligations in its letter to Skanska. Nor were they unilateral because Skanska never invoked § 4.3(b). Therefore, the calls were *void ab initio*, and Lane should get to free ride on the some $80 million its partners overpaid to keep the project afloat.

---

[11] Section 4.3(b) required one of the following justification: (i) "to correct or address an emergency situation"; (ii) to "comply with or avoid a material default or waiver of rights under the [DBA]"; (iii) to avoid a delay that might "result in a failure to meet the milestone dates set forth in the [DBA]"; or (iv) to "avoid a material breach . . . of any environmental or safety regulations."

Much like McNamara's theory on termination, this view is "unsupportable." Notwithstanding any technical deficiencies in the capital call process, Lane must now make its partners whole. We separate our analysis into two buckets: (1) the January 2021 Call; and (2) all capital calls thereafter.

### 1. January 2021 Call

We find it likely that the January 2021 Call was issued unanimously because a reasonable party would interpret the statement "I review [sic] it and it looks ok to me" to constitute affirmative assent. *Threshold L & H Const. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. Dist. Ct. App. 2011) (explaining that "assent [can be] manifested through written or spoken words, or inferred in whole or in part from the parties' conduct" (internal quotation omitted)).

Nevertheless, Lane is correct to point out that the District Court was required to view all evidence in a light most favorable to Lane before granting summary judgment to Skanska and Granite. *See Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024). So, if it was not eminently clear that Lane assented, and if Lane's assent was a condition precedent to the January 2021 Call's enforceability, then the Court should have denied summary judgment. *See Racing Props., L.P. v. Baldwin*, 885 So. 2d 881, 882–83 (Fla. Dist. Ct. App. 2004) ("It is elementary that there must be at least substantial performance of conditions precedent in order to authorize a recovery as for performance of a contract."). Instead, the Court found this argument to be a "red herring" because Skanska's unilateral authority stood to authorize the capital call all the same.

Lane argues that the District Court erred by deciding the dispute on Skanska's unilateral authority because Skanska never sent written notice, which was required by the plain language of § 4.3(b). Without this notice, Lane claims, it had "no opportunity" to invoke § 7.2—which would have allowed it to challenge Skanska's justification. Appellant's Br. 55. But the District Court addressed this argument, and we think it did so correctly. The Court acknowledged that Skanska's notice was, as a "technical" matter, insufficient under § 4.3(b). But it further explained that such a minute, procedural oversight would not excuse Lane's payment and would be forgiven by Florida's doctrine of substantial performance.

Substantial performance is "'that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny' the other party the benefit of the bargain." *Green Tree Servicing, LLC v. Milam*, 177 So. 3d 7, 14 (Fla. Dist. Ct. App. 2015) (quoting *Casa Linda Tile & Marble Installers Inc.*, *v. Highlands Place 1981 Ltd.*, 642 So. 2d 766 (Fla. Dist. Ct. App. 1994). Lane's primary contention is that, by failing to provide notice and a § 4.3(b) justification, Skanska deprived Lane of its opportunity to object to the call. For the following three reasons, we find this immaterial.

First, Lane's objection powers were limited. Section 7.2 allowed a dissenting party to dispute only *"the need for or the amount of"* a unilateral call. In other words, if SGL needed $21 million to pay its bills and to avoid defaulting on the DBA, Lane could not

challenge the call on account of its distaste for Skanska's management style or its alleged conflict with I4MP. Moreover, were Lane to object to the call anyway, the remedy would be to appoint a certified public accountant to independently review whether the amount called was "reasonably required to meet projected cash requirements for the performance of the [DBA]." Section 7.2 was clear that Lane and Granite were required to fulfill the call while any dispute was pending.

Second, nothing in the JVA prevented Lane from objecting to the January 2021 Call without Skanska's formal notice. Lane had actual notice that the call was being issued, and it has maintained throughout litigation that it never voted for it. So, if Lane is telling the truth, and if its vote was necessary for a unanimous issuance, then the only logical source of authorization for the January 2021 Call was § 4.3(b). Even if Lane was unsure, there would be no harm in objecting anyway.

Finally, Lane could not have objected in good faith. Lane has never disputed that SGL needed the cash from the January 2021 Call to keep funding the project. And when asked in deposition whether Lane had any intention of paying the January 2021 Call, a representative for Lane admitted, "[a]t this point, Lane was not going to pay this call. We were heading toward litigation." Accordingly, we think it would be quite unreasonable to deny Skanska and Granite the benefit of the bargain over some missing paperwork—paperwork which would have done nothing to change Lane's decision not to pay. *See Green Tree Servicing, LLC*, 177 So. 3d at 14.

### 2. Subsequent Capital Calls

SGL's post-January capital calls are also free to rest on Skanska's unilateral authority and the doctrine of substantial performance. But here, Lane's argument breaks down even further. When Lane filed suit against Skanska in January, it materially breached the JVA by unequivocally and incontrovertibly stating it would no longer pay capital contributions to SGL. *See Mori v. Matsushita Elec. Corp. of Am.*, 380 So. 2d 461, 463 (Fla. Dist. Ct. App. 1980) ("A prospective breach of contract occurs when there is absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract."). And, as we have just described, its failure to pay the January 2021 Call was a breach in and of itself.

Section 8 of the JVA explained what would happen to a party that failed to pay its share of a capital call. Specifically, § 8.2(a) provided that a defaulting party "shall no longer have any right to participate in the management of [SGL], and shall not have any vote on the Executive Committee." On January 28, 2021, Skanska informed Lane that it could no longer serve on the Executive Committee until its default was cured. Because the capital calls made thereafter were approved by Skanska and Granite, and because Skanska and Granite's representatives then comprised the entirety of the Executive Committee, those calls were "unanimous" under the terms of the JVA.

## B. Indemnity

Next, Lane challenges the District Court's order requiring Lane to indemnify Skanska and Granite. "When contractual language is clear and unambiguous, courts cannot indulge in construction or interpretation of its plain meaning." *BMW of N. Am., Inc. v. Krathen*, 471 So.2d 585, 587 (Fla. Dist. Ct. App. 1985). Having established that Lane breached the JVA, the question of indemnity is simple.

JVA § 3.2 provides: "If, for any reason, any of the Parties incurs any liabilities or is required to pay any losses in excess of its Proportionate Share, the other Parties shall indemnify, hold harmless and shall reimburse such Party in such amount so that each Party will have paid its Proportionate Share thereof." Similarly, § 8.4 provides that a "Defaulting Party will indemnify and hold harmless . . . the Non-Defaulting Parties for any expense, loss, claims or liabilities including all legal fees, court costs, disbursements and expenses incurred as a result of the Defaulting Party's breach of its obligation to make Working Capital contributions." These provisions, independently and together, beyond any shadow of a doubt, require Lane to indemnify Skanska and Granite for its intentional breach.[12]

---

[12] After trial, Skanska and Granite filed motions for attorneys' fees. The Court denied the motions without prejudice in light of this pending appeal. Those motions may be renewed following the issuance of our mandate.

24-12638                Opinion of the Court                27

## C. Prejudgment Interest

Finally, Lane challenges the District Court's imposition of prejudgment interest. Lane argues that Skanska and Granite had an avenue to secure prejudgment interest under the JVA, but they failed to take the steps necessary to do so. Specifically, JVA § 8.2 permits a non-defaulting party to pay a defaulting party's proportionate share of a capital call and treat it as a "demand loan" subject to a contractual interest rate. The District Court concluded that Skanska and Granite's overpayment did not constitute demand loans.[13] Its reasoning was rather technical, putting form over substance, but that decision is not properly before us on appeal.[14] Section 8.2 notwithstanding, the District Court applied prejudgment interest under Florida's statutory rate. *See* Fla Stat. § 55.03.

---

[13] One exception occurred when Skanska paid $570,000 on top of its proportionate share of the September 2021 capital call.

[14] The District Court did not fully explain why the payments should not be treated as demand loans, but Lane's argument goes as follows. Rather than pay Lane's capital calls directly, SGL issued larger-than-necessary capital calls which mathematically accounted for Lane's refusal to pay. For example, if SGL needed $14 million, SGL would request $20 million, knowing that Lane's $6 million share would go unpaid. Therefore, neither Skanska nor Granite paid "Lane's proportionate share" of the calls, as contemplated by § 8.2. Of course, on a more functional level, Skanska and Granite absolutely paid Lane's share. Keeping with the same example, had SGL called $14 million, and Skanska and Granite each paid a portion of Lane's $4.2 million obligation, we would have a clear demand loan. This technicality appears to have cost Skanska and Granite the differential between the contractual interest rate (~11.5%) and Florida's statutory rate (~8.5%) on the $80 million owed.

Lane argues statutory prejudgment interest was improper because JVA § 8.2 provided "the exclusive mechanism for obtaining prejudgment interest on defaulted capital calls." Appellant's Br. 57. We disagree. Successful Florida plaintiffs are entitled to prejudgment interest as a matter of law. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985) ("In short, when a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss."). Anything else fails to make the plaintiff whole and allows the defendant to profit from his breach.

That is not to say parties cannot contract around prejudgment interest or establish an alternate rate. *See DSLRPros, Inc. v. Lalo*, 339 So. 3d 379, 383 (Fla. Dist. Ct. App. 2021). But Lane fails to identify anywhere in the JVA that does so. Instead, it points to § 8.2 which merely presents the non-defaulting parties with *the option* to treat an overpayment as a demand loan. Moreover, just a few lines down, the JVA clearly states that "remedies in this Agreement for a breach by a Party of its obligation to make Working Capital contributions are in addition to and will not limit any other remedies in law or equity" held by the non-defaulting parties or SGL. Skanska and Granite are entitled, as a matter of law and fundamental fairness, to prejudgment interest.

### III. Breach of Fiduciary Duty

Next, we review the District Court's finding that Skanska did not breach its duty of loyalty.[15] This Court reviews factual findings after a bench trial only for clear error.[16] *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018); *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). "Clear error exists if after reviewing the entire record, we are 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Brown*, 996 F.3d 1171, 1182 (11th Cir. 2021) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542 (1948)). On the other hand, we review de novo the District Court's legal conclusions as well as its application of the law to the facts. *CFTC*, 894 F.3d at 1322.

At trial, Lane argued that Skanska rejected the Termination Request while wearing two hats: one for SGL and one for I4MP. By rejecting termination, Lane argued that SGL suffered extensive, avoidable losses. The District Court disagreed, finding that even

---

[15] On appeal, Lane makes no attempt to revive its duty of care/gross negligence claim nor its duty of good faith and fair dealing claim. We treat those claims as abandoned.

[16] An exception to this clear-error standard occurs if the "district court 'applies an incorrect legal standard which taints or infects its findings of facts.'" *Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257, 1261 (11th Cir. 2007) (quoting *NAACP, Jacksonville Branch v. Duval Cnty. Sch.,* 273 F.3d 960, 965 (11th Cir. 2001)).

threatening termination would have caused "significant damage" and that Skanska decisively acted in the best interest of SGL by standing opposed. The Court found it unnecessary to address Lane's conflict allegation, explaining that "whether there was actually a conflict is of no moment because the dispositive question is whether Skanska [] acted on that conflict to *Lane's detriment*, which the evidence shows it did not."

Lane argues on appeal that, by skipping the conflict inquiry, the District Court misapplied Florida law. Unlike corporate law, Lane contends that Florida partnership law has a strict "no-conflicts" approach and that the harm to the partnership is only relevant in fashioning a remedy. Lane therefore argues it is eligible for equitable relief even if it cannot prove damages. Yet Lane maintains that it did suffer damages, appealing the District Court's contrary finding on the grounds that it was "tainted" by misapplication of law. *See Holton*, 490 F.3d at 1261.

Lane raises an interesting question about a partner's duty of loyalty. Unfortunately for Lane, the District Court's factual findings were simply too damning, and they were made with the strong weight of evidence behind them. We hold, albeit on different grounds from the District Court, that Skanska did not breach its duty of loyalty. Lane is not entitled to relief—legal or equitable.

### A. FRUPA's Duty of Loyalty Governs SGL

We begin with Florida's Revised Uniform Partnership Act ("FRUPA"), which governs partnerships organized in Florida. As a threshold matter, neither party disputes that SGL, a Florida joint

venture, is subject to FRUPA. *See* Fla. Stat. § 620.8202(1) (2025) ("[T]he association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership."); Fla. Stat. § 620.8202 cmt. 2 ("Relationships that are called 'joint ventures' are partnerships if they otherwise fit the definition of a partnership."). Consequently, Skanska owed SGL and each member of the joint venture two duties: (1) a duty of care; and (2) a duty of loyalty. *See* Fla. Stat. § 620.8404. Only the duty of loyalty is at issue on appeal.

Skanska acknowledges that it owed a duty of loyalty—but it contends that the contours of that duty lie within the four corners of the JVA, rather than in FRUPA. Indeed, Florida law allows partners to modify the duty of loyalty by express agreement. *See* Fla Stat. § 620.8103. Gone are the days of Cardozo's "unbending and inveterate" edict that joint adventurers "owe to one another . . . [n]ot honesty alone, but the punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

FRUPA § 8103 addresses how, and to what extent, partners can recalibrate the duty of loyalty. It begins with the proposition that FRUPA governs inter-partner relations "to the extent the partnership agreement does not otherwise provide." Fla. Stat. § 620.8103(1). It then explains that a "partnership agreement may not . . . [e]liminate the duty of loyalty . . . but . . . [it] may identify specific types or categories of activities that do not violate the duty

of loyalty, if not manifestly unreasonable."[17] *Id.* § 620.8103(2)(d)1. Alternatively, FRUPA allows all partners, or a predetermined percentage thereof, to authorize or ratify the act upon a full disclosure of all material facts. *Id.* § 620.8103(2)(d)2.

Section 8103 was surely drafted with ventures like SGL in mind. A rigid approach to self-dealing, à la Cardozo, would have a chilling effect on conflict-rich business models. This message is hardly lost on Skanska, who had the following to say in its brief on appeal: "The ruling sought by Lane [i.e., a strict no-conflict rule] would . . . jeopardize the entire P3 project delivery model because design-build joint venturers are commonly related to concessionaires on P3 projects." Skanska Appellee's Br. 30. This sentiment, though, overlooks § 8103, which allows P3 ventures to devise their own fiduciary boundaries up front or cleanse transactions with informed consent.

Nevertheless, Skanska argues that SGL's JVA *does invoke* § 8103(2)(d). It specifically points us to three provisions: JVA §§ 4.3, 5.4, and 10.5(iv). JVA § 4.3 reads, in relevant part:

> **Powers of the Executive Committee.**
>
> (a) Decisions of the Executive Committee and decisions of the Parties must be unanimous. . . .

---

[17] This nuanced approach to allowing modifications to the duty of loyalty can be contrasted with Delaware, which lacks a comparable limitation, and which expressly affords "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." Del. Code tit, 6 § 15-103(b), (d) (2026).

> (b) If unanimous vote or consent cannot be obtained for any matter and the Managing Party asserts in writing to the other Parties that it believes approval is critical in order for the Joint Venture to fulfill its obligations under the [DBA], then the Managing Party may take such actions as it *determines in good faith* are reasonably necessary or appropriate . . . .

SGL JVA § 4.3 (emphasis added).

Skanska argues that, because § 4.3(b) requires it, as Managing Party of SGL, to act in "good faith" when operating unilaterally, we should evaluate its actions under a "good faith" standard rather than under FRUPA. But § 4.3(b) is not relevant to the dispute at hand because SGL's decision not to invoke the Termination Request was not unilateral action by Skanska. Rather, the Termination Request was not invoked because the parties failed to secure unanimous consent under § 4.3(a). Even if § 4.3(b) were at play here, it plainly does not exculpate "specific types or categories of activities" from violating the duty of loyalty. More sensibly, it is read to *add* a duty of good faith, which is not a duty conferred by FRUPA. *See* Fla. Stat. § 620.8404.

Skanska next points us to § 5.4 of the JVA. That provision reads, in full:

> **Standard of Care.** The Managing Party will not be liable to the Joint Venture or to any Party for any act or omission . . . unless the Managing Party has engaged in gross negligence, willful misconduct or bad faith.

SGL JVA § 5.4.

Section 5.4, as foreshadowed by its heading, uses quintessential *duty-of-care* terminology.[18] The provision makes no reference, express or otherwise, to the duty of loyalty.[19] Although Lane originally alleged gross negligence, it has abandoned its duty of care claim on appeal. Accordingly, § 5.4 is of no use.

Finally, § 10.5 requires the parties maintain a certain liquidity level. Subsection (iv) thereunder specifies that if a party fails to maintain that liquidity, the other parties can fashion a remedy "appropriate to satisfy the fiduciary requirements . . . *as established in this Agreement*." While this excerpt, at best, might embody a generalized intent to limit fiduciary duties to those "established in" the JVA, it clearly does not limit the duty of loyalty in the manner contemplated by FRUPA.

We reiterate that SGL could have exculpated categories of conduct from the duty of loyalty. *See McCoy v. Durden*, 155 So. 3d 399, 406–07 (Fla. Dist. Ct. App. 2014) (describing an operating agreement that carefully contemplated hypothetical conflicts to

---

[18] FRUPA § 8103(2)(e) allows a partnership agreement to, within reason, limit the duty of care. Fla. Stat. § 620.8103(2)(e).

[19] Section 5.3's mention of "bad faith" is unavailing insofar as Skanska argues it unseats baseline loyalty principles. The concept of faithfulness is amorphous; it is neither coextensive with the duty of care nor the duty of loyalty. And FRUPA does not authorize a partnership to replace the duty of loyalty with a duty to abstain from "bad faith," the latter concept being "[s]hrouded in the fog of . . . hazy jurisprudence." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 754 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

carve them out of the duty of loyalty under Florida's analogous Limited Liability Company Act). It also could have established procedures to deal with conflicts—created independent committees or agreed to abide by the advice of outside counsel. Given the sheer magnitude of the joint venture and Skanska's looming potential conflict known from the very beginning, it is surprising the JVA failed to even conceive of a conflict, let alone institute safeguards. But it did not—and Skanska's argument to the contrary is unpersuasive. We are left with the one-size-fits-all duty of loyalty established by the Florida Legislature.

## B. We Leave Open Whether FRUPA has a Fairness Defense

Having established that FRUPA and the common law duty of loyalty governs this dispute, we now explore what that duty is. FRUPA § 8404 provides a starting point:

> (2) A partner's duty of loyalty to the partnership and the other partners is limited to the following:
>
> > (a) To account to the partnership . . . any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business . . . ;
> >
> > (b) To refrain from dealing with the partnership in the conduct . . . of the partnership business *as or on behalf of a party having an interest adverse to the partnership*;
> >
> > (c) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

Fla. Stat. § 620.8404(2) (emphasis added).

Lane claims that Skanska, in contravention of FRUPA, "deal[t] with the partnership . . . as or on behalf of a party having an interest adverse to the partnership." *See* Fla Stat. § 620.8404(2)(b). To get a better understanding of what this language means, we explore its origin. FRUPA was substantially modeled after the Revised Uniform Partnership Act of 1997 ("RUPA"). *See* Unif. P'ship Act (Unif. L. Comm'n 1997). Section 8404(2)(b) was taken verbatim from RUPA § 404(b)(2), which includes the following commentary:

> This rule is derived from Sections 389 and 391 of the Restatement (Second) of Agency. Comment c to Section 389 explains that the rule is *not based upon the harm caused to the principal, but upon avoiding a conflict* of opposing interests in the mind of an agent whose duty is to act for the benefit of the principal.

Unif. P'ship Act § 404 cmt. 2 (emphasis added).

Indeed, Comment c to the Restatement affirms that it is the conflict itself, rather than any particular harm caused, that creates a cause of action:

> The rule . . . is not based upon existence of harm to the principal in the particular case. It exists to prevent a conflict of opposing interests in the minds of agents whose duty it is to act solely for the benefit of their principals. The rule applies, therefore, *even though the transaction between the principal and the agent is beneficial to the principal*.

Restatement (Second) of Agency § 389 cmt. c (A.L.I. 1958) (emphasis added).

Recall, now, the District Court's statement that "whether there was actually a conflict is of no moment because the dispositive question is whether Skanska [] acted on that conflict to *Lane's detriment*, which the evidence shows it did not." *Lane Constr. Corp.*, 2024 WL 4267117, at *12. (emphasis in original). This holding is difficult to square with the plain language of FRUPA, as well as the commentary of its drafters. It seems as though the District Court applied an affirmative defense on the grounds that Skanska acted fairly to the joint venture and caused it no harm. In announcing this standard, the District Court cited no binding Florida precedent. So where did it come from? While we cannot say for sure, we recognize that a "fairness" defense is quite often applied when evaluating conflicted-interest transactions.

Florida's Business Corporation Act, for instance, allows a conflicted transaction to stand if the interested director can show that the transaction was "fair" and "beneficial to the corporation." Fla. Stat. § 607.0832(1)(b), (3)(b). Florida's Limited Liability Company Act does the same. Fla. Stat. § 605.04092(2) (stating that a member's "material financial interest" in a transaction is "not grounds" for legal or equitable relief so long as the conflicted-interest transaction was "fair to the limited liability company at the time it [was] authorized"). This approach embraces the reality that business conflicts are commonplace, and that an overly rigid fiduciary standard can get in the way.

But here we have a partnership, not a corporation and not an LLC. Are there grounds for importing a fairness defense into partnership law? In 2013, the Uniform Law Commission ("ULC") decided there were. That year, the ULC released its Harmonized Revised Uniform Partnership Act ("HRUPA")—its latest work on the subject. HRUPA, unlike its predecessor, includes the following language: "It is a defense to a claim under subsection (b)(2) and any comparable claim in equity or at common law that the transaction was fair to the partnership."[20] Unif. P'ship Act § 409(g) (Unif. L. Comm'n 2013).

If Florida had adopted HRUPA, the District Court's holding would be unimpeachable. But, of course, in the thirteen years since the ULC's revision, Florida has not updated its partnership Act.[21]

---

[20] The Uniform Law Commission explained this addition with a comment:

> This subsection codifies judge-made law applicable to all business entities. *See, e.g., Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1116 (Del. 1994) (discussing "entire fairness" in the context of a corporation's merger with an affiliate); *Lonergan v. EPE Holdings, L.L.C.*, 5 A.3d 1008, 1019 (Del. Ch. 2010) (discussing "entire fairness" in the context of a limited partnership"); *Gottsacker v. Monnier*, 697 N.W.2d 436, 444 (Wis. 2005) (referring to "a willful failure to deal fairly with the LLC or its other members").

Unif. P'ship Act § 409 cmt. to subsection (g) (Unif. L. Comm'n 2013).

[21] The fact that Florida failed to update FRUPA in 2013 is arguably more salient when taken with the fact Florida updated its LLC Act that very year, in part to conform with its respective uniform act. *See* 2013 Fla. Sess. Law Serv. Ch. 2013-180 (West); Unif. Ltd. Liab. Co. Act (Unif. L. Comm'n 2013).

Skanska erroneously relies on this unenacted provision in its brief, arguing that it "defeat[s] Lane's argument that FRUPA does not allow for a fairness defense." Skanska Appellee's Br. at 33 (internal quotation marks omitted).

We are unaware of any Florida precedent suggesting a fairness defense should be read into Florida's existing law. Nevertheless, we acknowledge that the Florida Supreme Court *could* do just that. A fairness defense would be consistent with Florida common law, which typically rejects a cause of action for breach without a corresponding "damage or injury." 55 Fla. Jur 2d Torts § 3 ("[N]o valid cause of action is established where there is shown to exist, at the very most, a 'wrong' without 'damage.'"); *see also Am. Sales & Mgmt. Org. LLC v. Lopez*, 373 So. 3d 1198, 1208 (Fla. Dist. Ct. App. 2023) (reversing defendant's motion for directed verdict because plaintiff "failed to prove damages, an essential element of its breach of fiduciary duty claim"). Delaware's Court of Chancery took this somewhat atextual, common-law approach when confronted with language identical to FRUPA's, asking not only whether a conflicted-interest transaction took place, but also whether it was fair to the partnership. *See B & L Cellular v. USCOC of Greater Iowa, LLC*, No. CV 7628-VCL, 2014 WL 6882207, at *3 (Del. Ch. Dec. 8, 2014).

If our disposition hinged on the existence of a fairness defense, we might certify the question to the Florida Supreme Court or prognosticate their approach. *See West v. American Telephone &*

*Telegraph Co.*, 311 U.S. 223, 236–37, 61 S. Ct. 179, 183 (1940). However, we find Lane's position untenable even if the District Court erred, so we decide the case on different grounds.

For Lane to succeed on appeal, this Court would need to hold *each* of the following: (1) the potential conflict between Skanska and SGL became a real, cognizable conflict; (2) Skanska acted on that conflict; (3) the District Court improperly ascertained whether the Florida Supreme Court would apply a common-law fairness defense to FRUPA; and (4) the District Court's legal error tainted its factual findings to a degree that warrants reversal. *See Holton*, 490 F.3d at 1261. We hold that there was not a cognizable conflict between Skanska and SGL, so we do not reach the second, third, or fourth issue.

## C. Skanska's Interests Were Not Adverse to Lane's

FRUPA does not prohibit all arrangements that might yield a conflict or even all transactions where a partner has a dual stake in the outcome. Rather, § 8404 prevents a partner from transacting with the partnership "[1] *as or on behalf* of a party [2] having an interest *adverse* to the partnership." Fla. Stat. § 620.8404(2)(b) (emphasis added). Here, that means Lane had the burden to demonstrate not only that a party with an adverse interest to SGL existed somewhere in the ether, but also that Skanska acted "as or on behalf" of said party.[22] Lane did not make this showing at trial.

---

[22] Lane incorrectly presents the question as simply whether "SGL's and I4MP's interest [sic] were adverse." Appellant's Reply Br. 35. The more appropriate

Lane argues that, because Skanska ID owned half of I4MP, there was necessarily a conflict of interest. But as we have just explained, FRUPA requires a threshold finding that Skanska acted "as or on behalf of" a party with interest adverse to the partnership. *See* Fla. Stat. § 620.8404(2)(b). Skanska itself was a distinct corporate entity whose interest in the I-4 Ultimate Project was limited to its stake in SGL. The only parties that plausibly had an adverse interest to SGL were I4MP and Skanska ID. Thus, Lane had the burden to provide at least some indication that Skanska acted "*on behalf of*" one or both of them.

As Steven Lunsford, Skanska's in-house counsel, testified, Skanska and Skanska ID were separate companies with different cultures, different corporate structures, and different management." The district court found his testimony to be credible. DiPaolo went further, explaining that the relationship between Skanska and Skanska ID was downright "acrimonious." DiPaolo testified that, as he navigated Skanska's legal affairs, he did not consider Skanska ID's interests because Skanska ID was a "different company" that had "nothing to do with [Skanska]." Lane's strongest evidence to the contrary is one email whereby Skanska AB's CEO wrote to Skanska USA's CEO the following: "I believe we need to work around this issue with also I4MP's undertaking in mind." But Lane presented no evidence that the email was

_____

question is whether Skanska, as a fiduciary to SGL, acted on behalf of I4MP, the party with an allegedly adverse interest to SGL.

answered, acted on, or even that it was passed down the ladder to Skanska.

Even if we were to assume that Skanska acted as a mere vessel for Skanska ID or I4MP, Lane's claim would still fail because Lane did not show that those parties had "an interest adverse" to SGL with respect to the Termination Request. *See* Fla. Stat. § 620.8404(2)(b).

FRUPA does not define the term "adverse." "When a contested term is undefined . . . [Florida courts] presume that the term bears its ordinary meaning at the time of enactment, taking into consideration the context in which the word appears." *Conage v. United States*, 346 So. 3d 594, 599 (Fla. 2022). Dictionaries are often a starting point. *Steele v. Comm'r of Soc. Sec.*, 385 So. 3d 587, 590 (Fla. 2024). Merriam-Webster's Dictionary defines "adverse" as "acting against or in a contrary direction: hostile." *Adverse*, Merriam-Webster, https://www.merriam-webster.com/dictionary/adverse (last visited Feb. 8, 2026).

We therefore find it necessary to ask whether an allegedly conflicted partner has been pulled away from the partnership's optimal course of action by some competing interest.[23] If not, the partner's interests cannot be said to be adverse to the partnership.

---

[23] This analysis should be objective, rather than subjective. If one partner unreasonably believes the parties' interests are adverse, that would not evidence an objective conflict. Thus, the fact that Lane subjectively preferred to pursue termination while Skanska disagreed does not mean the parties' objective interests were adverse.

Adversity is a highly fact-intensive inquiry. And facts after a bench trial "must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). Here, the District Court did not make a factual finding directly on point, concluding instead that it was "of no moment" whether a conflict existed. However, its other findings and our independent review of the record make clear that there was no adversity.

The record reveals that rejecting termination was not just fair to the partnership—it was the only sensible option. Yes, the broader Skanska enterprise would have suffered more from termination vis-à-vis Lane and Granite. This suggests that Skanska, if it were acting on behalf of its affiliates, might have *different* interests from Lane and Granite. But for those interests to be *adverse to the partnership*, they would have had to call for some departing course of action. Instead, the District Court found that rejecting termination was in the best interest of the partnership as a whole. And if Lane were acting sensibly, it too would have rejected termination.

Lane has pleaded the case ad nauseum that SGL was best off sending the Termination Request to I4MP as early as possible. But those pleas have fallen on deaf ears, being rejected by Skanska, Granite, Holland & Knight, VLP, the drafter of the DBA, the District Court, and now this Court.

Granite's opposition, in particular, speaks volumes because Granite was essentially in the same shoes as Lane. For that very reason, Lane knew Granite's position would be essential to present a compelling case against Skanska in court. Internal emails reveal

Lane desperately tried to turn Granite against Skanska. In 2018, a Lane executive wrote to Alger:

> [M]r Salini has injected himself personally into this; he want [sic] a top USA lawyer to look into this matter . . . I suggest you check what is the position of Granite on this; Salini is not afraid to pick-up a fight (no matter the consequences) but he does rationally and most of the time he gets it right. The position of Granite on this is fundamental.

In another email, a WeBuild executive wrote to Alger in hopes that Alger could convince Granite to stop paying cash calls and to sign onto Lane's demand letter. Granite did not bite. It voted against termination, put in extra money to save the project, and exclusively joined Skanska's side of the "v" in litigation. The District Court correctly found this persuasive.

To put it bluntly, the Termination Request was a terrible idea. For it to succeed, I4MP would have to pass on SGL's Termination Request to FDOT despite all financial incentives to the contrary and a strong legal argument that it was not required to do so; FDOT would have to accept the notice instead of fighting it in court; and even then, FDOT would still have to voluntarily release SGL from the DBA instead of exercising its Step-in Rights, knowing full well that any new design-build contract would cost a fortune. In reality, SGL would have faced opposition at every turn.

As for the prospect of merely threatening termination, Lane thinks it would have increased SGL's bargaining power and led to a better deal with FDOT. We have our doubts. While it is

impossible to know how FDOT and I4MP would have reacted, we presume they would have seen the obvious—SGL lacked the upper hand. The District Court put it best:

> Threatening termination would mean [SGL] would lose any opportunity for reasonable negotiation with FDOT about the [sinkhole] claim or anything else. There would be no wiggle room on the completion date, putting [SGL] at almost certain risk of defaulting . . . . And the partners would have to keep working during the disputes even after they tried to terminate, while being flyspecked by FDOT and having to "dot every I and cross every T." There would be litigation for years with both I4MP and FDOT. And not just this Project would be at risk; other current and future construction projects would be threatened, the companies would have to disclose whether they had been defaulted on all upcoming projects as a permanent black mark on their records, and they would be "persona non grata" with FDOT, a massive customer.

*The Lane Constr. Corp*, 2024 WL 4267117, at *9.

And what damages could Lane possibly trace from Skanska's vote against termination? "In Florida, unless the factfinder is presented with evidence which will enable it to determine damages . . . with a reasonable degree of certainty, rather than by means of speculation and conjecture, the claimant may not recover such damages." *Himes v. Brown & Co. Sec. Corp.*, 518 So. 2d 937, 938 (Fla. Dist. Ct. App. 1987). Before constructing a Termination-Request counterfactual, we would have to assume that Skanska's change in

position would sway Granite's vote on the matter. That on its face is pure conjecture. Most importantly, any financial savings to SGL would be heavily offset by reputational damage and the firms' inability to get work going forward.[24] We do not disturb the District Court's finding that SGL would have been worse off if it pursued the Termination Request. But even if we did, this Court could not entertain such speculation.[25]

---

[24] Alger, to his credit, knew WeBuild was playing a dangerous game. In late 2018, he warned WeBuild executives:

> In my view we have to do something as this is getting out in the industry that we are not making a cash call[.] One major JV partner on a large transit project in Seattle is saying they may break up the agreement because Lane can't be trusted to stay in a job when it goes the wrong way. This is serious business and we have got to address this now[.] *We will be blackballed in the US if we continue on the path that we are on*, but if that is what you choose then so be it. It has already begun.

[25] Lane dedicates extensive briefing to identify various equitable remedies the District Court could have ordered even if it found damages inappropriate. Because we find no breach, we do not reach these arguments. However, we stop to highlight the considerable delay between Lane's perception of the conflict and its decision to bring suit. As early as October 2018, when the parties gathered in New York to consider the Termination Request, Botella testified that he saw a "clear conflict of interest" presenting in the body language of Skanska executives. Yet Lane did not act until 2021, after SGL had already waived its (likely nonexistent) termination rights and racked up the damages Lane so alleges. It is a longstanding principle of equity that "equitable remedies are not available if granting the remedy would be inequitable to the defendant because of the plaintiff's long delay." *Env't Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980). If Lane were so confident in the efficacy of the Termination request, it could have sought injunctive relief when the option was

## IV. CONCLUSION

When Skanska, Granite, and Lane joined forces to take on the multi-billion dollar I-4 Ultimate project, each assumed a profound set of risks. Foremost among them was the risk that conditions on the ground would drive SGL's costs above its contract price. The DBA simply did not offer much wiggle room for things to go wrong, nor did it provide an escape hatch. Look no further than § 20.2, which was captioned in bold: "No termination for Extended Relief Event[s]." SGL could not walk off the job, and no court was going to allow a couple of typos to change that fact.

So, when the going got tough, each member had a duty to behave responsibly, exercise appropriate foresight, and act with the best interest of SGL in mind. Skanska and Granite maintained their composure. Lane did not. Throughout litigation, Lane has argued that Skanska's well-reasoned hesitancy to pursue termination was mere pretext for its conflict of interest. The record reveals quite the opposite. It was Skanska's alleged conflict that formed the pretext for Lane to stop funding SGL and make its partners clean up the mess.

For the foregoing reasons, we **AFFIRM**.[26]

---

being considered, rather than years after-the-fact. Its decision to wait invites more questions than answers.

[26] On March 4, 2025, Skanska moved this Court to strike portions of Lane's reply brief. Lane opposed Skanska's motion to strike and, in the alternative, moved to supplement the record. These motions are DENIED.

24-12638                NEWSOM, J., Concurring                1

NEWSOM, Circuit Judge, specially concurring:

I join Parts I, II, and IV of the Court's opinion, as well as most of III.C. I do not joint Parts III.A or III.B, or the portion of Part III.C that begins "Even if we were to assume"—none of which (to my way of thinking) is necessary to the decision of the case. *Cf. United States v. Files*, 63 F.3d 920, 931 (11th Cir. 2023) (Newsom, J., concurring) ("Reasonable minds can differ, of course, but my own view . . . is that federal appellate courts should issue fewer alternative holdings.").

# APPENDIX A

## I-4 Ultimate Project Structure Chart



GUARANTORS
[1] Skanska AB
[2] John Laing plc
[3] Skanska USA Civil Inc.